HOMER HOMAN v. MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, and CAPITOL STAGE LINES COMPANY, Appellants.—70 S. W. (2d) 869.

Division One, April 19, 1934.

*Thomas J. Cole* and *Roy W. Rucker* for Missouri Pacific Railroad Company.

*O. H. Swearingen* and *Bohling & Bohling* for respondent.

FERGUSON, C.—The plaintiff Homer Homan and his wife, Mildred Homan, resided at Kansas City, Missouri. On Christmas day, 1928, they were visiting at the home of plaintiff's father at Smithton, Missouri. In the afternoon of that day, intending to return to their home, they boarded a motorbus bound for Kansas City. The bus was owned and operated by the defendant Capitol Stage Lines Company which, as a common carrier of passengers, operated a line of motorbusses or coaches between St. Louis and Kansas City over U. S. Highway 50. As the bus, upon which plaintiff and his wife were passengers, traveling west, reached a crossing of Highway 50, over a railroad track of the defendant Missouri Pacific Railroad Company, known as the "fairground spur track," about a quarter of a mile west of the city limits of the city of Sedalia, a collision occurred between the bus and a railroad flat car which was being pushed north on said track, in front of two cattle cars, by one of defendant railroad company's switch engines. Both plaintiff and his wife were injured. Plaintiff brought this action for damages against both the bus company and the railroad company as joint tort-feasors. The petition is in two counts; the first count asks damages for personal injuries sustained by plaintiff; the second for damages for loss of services "assistance and consortium" of his wife on account of the injuries which she sustained together with medical, nursing and hospital expense in her behalf. The case was submitted to a jury upon instructions which authorized a finding against either or both defendants. The verdict was against both defendants for damages on the first count in the sum of $25,000 and on second count in the sum of $20,000; judgment thereon was entered for $45,000. Defendants separately asked for and a separate appeal was granted to this court but the bus company having abandoned its appeal the railroad company alone has briefed and argued the case here.

The petition charged that the bus company negligently and carelessly operated its bus so as to cause or permit it to collide with the railroad flat car and alleged and enumerated several acts of negligence on the part of defendant railroad company, such as failure, to give statutory crossing signals, to give timely warning of the approach of the drag of cars, to keep look out, to stop before crossing the highway or to flag or protect the crossing and a violation of the humanitarian rule. However, as against defendant railroad company, but two grounds of negligence were submitted to the jury: (1) pri-

mary negligence; that defendant's switching crew failed to exercise ordinary care under the existing circumstances and conditions in not stopping the drag of cars before crossing the highway or sending someone forward to flag or protect the crossing; (2) negligence under the humanitarian rule. Each defendant claimed it was not negligent and that the injuries sustained by plaintiff and his wife were caused by the sole negligence of the other.

Appellant railroad company makes numerous assignments of error many of which are ruled and disposed of by the decision of this court, en Banc, in an action brought by Mildred Homan (wife of plaintiff) against these same defendants (Homan v. Mo. Pac. Railroad Co., 334 Mo. 61, 64 S. W. (2d) 617) for damages for personal injuries which she sustained in this collision. In that case plaintiff's wife, Mildred Homan, had verdict and judgment against both defendants. As here the railroad company alone presented and briefed the case on appeal and substantially, and in all material respects, the same facts shown in that case were developed in the instant case with instructions on the part of the plaintiff like unto those complained of in this case given. In the Mildred Homan case appellant did not question the amount of the verdict and judgment. All assignments there made by appellant were ruled against it and the judgment affirmed. Commissioner HYDE who wrote the opinion in the former case, which was adopted by the court en banc, made a clear and comprehensive statement of the facts and circumstances leading up to and attending the collision and reference thereto is had and excerpts therefrom, without quotation being specifically noted, are frequently used in the statement of facts which the writer has undertaken.

The defendant railroad company is often hereinafter referred to as the appellant. U. S. Highway No. 50, is referred to as the highway. The railroad company maintains extensive yards at Sedalia. The railroad track involved is located within the limits of appellant's Sedalia yards and is a spur track running south from appellant's main line track to the Missouri State Fairgrounds and is generally known and spoken of as the "fairgrounds spur." The highway at the point of intersection with and for some distance on either side of the crossing of the spur track runs east and west. The main line railroad tracks also run east and west parallel with, and about one-fourth mile north of, the highway. The spur track runs north and south, i. e., south from a main line track and ends at the fairgrounds. The spur track crosses the highway at grade, the rails being on a level or flush with the surface of the highway. The paved or macadamized portion of the highway is sixteen feet wide. We shall for convenience speak of this part of the highway as the pavement. A short distance west of the city limits of Sedalia the highway goes over a low ridge the crest of which is about 500 feet east from the intersection with, or

crossing of, the spur track. It descends from that point west, to the crossing on a grade of about two and one-half per cent. There is a bank two to three feet in height, above the level of the pavement, along the south side of the highway. This bank increases in height all the way down the hill, its highest point being near the spur track. There is also a bank along the east side of the spur track extending some 400 to 500 feet or more south from the crossing. Its highest point is also nearest the crossing. According to the witnesses for appellant the top or surface of this bank at its highest point is three and one-half feet above the level of the rails of the spur track but some of plaintiff's witnesses estimate the height of this bank at its highest point to be "something like five feet" above the rails of the track. On the south side of the highway and the east side of the spur track is a field or meadow which is higher in some places than the bank along the south side of the road. This field was enclosed with a wire fence composed of woven wire about two feet in height with two or three strands of barbed wire above. The fence ran along the south side of the right of way of the highway and the east line of the railroad right of way. Witnesses for plaintiff and the bus company testified, and photographs of the scene introduced in evidence reveal, that there was a thick, matted stand of stalks or stems of dead weeds and grass, varying in height from two to four feet, upon the embankment of the railroad right of way and along the fence east of the spur track extending several hundred feet south from the south line of the highway and there was much testimony that such condition obstructed the view from the highway, east of the crossing, of the railroad track south of the highway. Immediately west of the crossing and south of the highway a farm house, barns and other outbuildings are located extending south from the highway along and immediately west of the railroad right of way. As stated the macadamized or paved portion of the highway is sixteen feet wide. As the writer understands, the south line of the highway right of way at the crossing, which would be about on a line with the fence along the south side of the highway, is approximately twenty feet south of the south side of the pavement. The railroad track is "practically level" across and for some distance south of the highway. Appellant admitted that the highway was "a much traveled highway" and "the main highway between Sedalia and Kansas City." It was traveled "as much as any highway out of Sedalia, if not more." That there was a large, and well nigh continuous, volume of travel over this highway was well known to appellant's employees in charge of the locomotive engine and drag of cars involved in this collision. There were two railroad crossing signs both on the north side of the highway, one 375 feet east of the crossing and one about 17½ feet west of the crossing. The crossing was not protected by an automatic bell or signal nor by gates or a

watchman. However, during the annual State Fair the railroad company carried a rather heavy traffic over this spur track and it had been its custom during such period each year to keep a watchman at the crossing. At other times the spur track was used only at "infrequent intervals." The use of the track on this day, December 25, 1928, was one of these "infrequent intervals." A switching crew with a switch engine had been ordered to go south on the spur track to the fairgrounds stockyards for two cattle cars which had been loaded there. The switching crew was composed of the "switch engine foreman," the engineer, fireman and two switchmen. As the switch engine went on to the spur track one switchman was left at the main line track "to see if passenger train 15 went by" during the time the switch engine was going to and returning from the fairgrounds stockyard. Had this switchman been stationed at the crossing he could have protected the crossing (and doubtless have averted this tragic collision) and at the same time have observed the passage of any trains on the main line. Returning from the fairgrounds stockyards the switch engine was south of the "drag of cars" pushing three cars north; the two loaded cattle cars being next to and north of the engine and the third or front car north of the two cattle cars an empty flat car. The flat car was about 40 feet long and the floor or deck was about 42 to 46 inches above the rails. There was a conflict in the evidence as to how much or what part of the engine and cars could be seen from the highway as the engine and cars approached the crossing from the south, in the manner described, through the cut immediately south of the crossing. There is ample and substantial evidence tending to show that no part of the flat car, the front or northernmost car, would be visible from the highway until it passed the fence and the line of the embankment at the southeast corner of the intersection and came out on the highway right of way. As the switch engine pushing the cars moved north through the cut immediately south of the crossing the engineer was, according to his testimony, on the right side of the cab, in his proper position to keep a lookout for traffic upon the highway which might be on or approaching the crossing and to immediately take such action as might be necessary to stop the engine. The switch foreman and the other switchman were standing on the north or forward car, the flat car; the foreman, "ten or twelve feet back from the north end of the car on the east side of the car" and the switchman about six feet back from the north end and also on the east side of the car. The overhang of the two intervening cattle cars prevented the engineer from seeing the switchmen who were standing on the flat car but from their position on the east side of the flat car either switchman could by extending his arm give signals to the engineer. There is evidence that a traveler on the highway approaching the crossing from the east could

see the head and shoulders of these men as the car moved north through the cut. The two switchmen testified they at all times had a clear view of the highway east of the crossing for a distance of 500 feet east or to the crest of the hill. There is testimony that the top or upper part of the cattle cars and engine were at all times in view and could be seen from the highway. On the other hand there was evidence tending to show that in traveling west along the highway toward the crossing there were points from which the view of the approaching engine and cattle cars or the men on the flat car would be cut off and so obscured and obstructed as to make discovery thereof difficult. It was admitted and the engineer testified that from his position in the cab he had a clear and unobstructed view of the full length of the highway from the crossing east to the crest of the hill, a distance of 500 feet. Despite the conditions, the known fact of a large volume of travel upon the highway, an unprotected crossing, the railroad track crossing on a level with the surface of the highway, infrequent use of the spur track, the embankment extending to the very edge of the highway right of way, the fences upon the embankment, the growth of weeds and grass upon the embankment obscuring and obstructing the view from the highway of a train, the location of the spur track within the yard limits, the switching movement then in progress thereon, the movement being made with the engine at the rear and pushing a low flat car in front of the box cars through a cut which concealed the presence of the flat car at the front, the switching crew did not stop the engine and cars before going upon the crossing nor send a flagman forward to protect the crossing. We make this observation in view of plaintiff's Instruction G, of which appellant complains and which we later discuss, authorizing a finding for the plaintiff if the jury found the surrounding conditions and circumstances of said crossing rendered it unusually dangerous and hazardous and that under the circumstances and conditions there and then existing the exercise of ordinary care required the engine and cars be stopped before crossing the highway "or that someone should be sent forward to flag or protect said crossing." In this connection plaintiff claimed defendant's Rule 103b was applicable to the situation there existing and that the engine and cars were run upon and over the crossing in violation of that rule. The rule reads: "Within yard and station limits, when switching or backing a train or cars over a public crossing at grade, one of the crew must protect the crossing unless it is protected by a flagman or gates." It is admitted, and appellant's employees and switchmen testified, that this spur track was "within the yard limits" of the Sedalia yards. This was "a public crossing at grade" and it was not "protected by a flagman or gates." The crew were yardmen, "assigned to yard duty;" the movement a switching movement; the

engine "a yard engine" and the crew engaged in switching work under a switch foreman and at the time of the collision were "switching or backing . . . cars over a public crossing at grade;" yet no member of the crew nor any other person was delegated or assigned to protect the crossing as required by Rule 103b. R. B. Morris, a witness for plaintiff, a former railroad man, testified that he had formerly worked for the "Wabash, Texas and Pacific, Frisco and Missouri Pacific;" that he was employed by the appellant for sixteen years during which time he served as yardmaster, trainmaster and acting superintendent and for twelve years was "rule man" for that railroad; that Rule 103b was one of the rules of the standard code of rules in effect on "a majority of the railroads in this country;" that he was a member of the "Standard Rules Committee" when said code of "Standard Rules" was adopted; and that Rule 103b applied to the situation existing at this crossing. The plaintiff had other testimony tending to show the applicability of this rule to that situation. The appellant claimed the rule did not apply. While it was admitted the spur track was "within yard limits," appellant's then yardmaster claimed that the spur track was not a yard track and that Rule 103b did not apply to that track. He testified as follows: "A yard track is a system of tracks within definite limits running parallel to the main track but this one leaves the main track and is not considered as one of the yard tracks." However, in connection with his testimony the definition of a "yard" set out in appellant's rule book was introduced in evidence. It will be noted this definition does not conform to the definition made by the witness. It reads: "Yard.—A system of tracks within defined limits provided for the making up of trains, storing of cars and other purposes, over which movements not authorized by time table, or by train order, may be made, subject to prescribed signals and rules or special instructions." The definition does not confine yard tracks to tracks "running parallel to the main track." It was unquestionably shown that this so called spur track was used for switching movements; the movement in progress in this instance was the switching of the loaded cattle cars which were consigned to a point in Illinois for the purpose of placing them in a train which was to move them to their destination; and it was admitted that the movements over this spur track were not such as were made or authorized by time table or train order. Appellant's yardmaster said the rule which covered this movement was: "When cars are pushed by an engine, except when shifting or making up trains in yards, a trainman must take a conspicuous position on the leading car." There was considerable testimony pro and con on the applicability of Rule 103b. In contemplation of our later ruling on appellant's demurrer to the evidence we note here that one ground of negligence charged against

defendant railroad company was failure to give or sound statutory crossing signals and it will suffice to say that as in the case of Mildred Homan v. Missouri Pac. Railroad Co., supra, there was substantial but conflicting evidence as to whether the bell on the engine was ringing and whether the whistle was sounded. The evidence on this trial on that issue was of the same character and nature as that in the former case and we there held the evidence sufficient to warrant the submission of that issue to the jury. While in this case the plaintiff did not elect to submit the issue by instructions to the jury nevertheless it was an issue in the case at the time the demurrer to the evidence was ruled by the trial court. The collision occurred about 2:40 or 2:45 in the afternoon. The sun was shining; the day was clear "and not very cold;" and the railroad track and the highway dry. The engine and cars were moving north on the spur track, in the manner described, at a rate of eight to ten miles per hour. The bus carried sixteen or seventeen passengers. Plaintiff and his wife were sitting on "the third or fourth seat" from the front on the left or south side of the bus as it traveled west toward this crossing. The bus left Sedalia "one-half to three-fourths of an hour behind its scheduled time" and there was evidence that the driver said he was going to get to Kansas City on time. All the numerous witnesses agree and state that the speed of the bus was not at any time slackened from the time it came over the crest of the hill 500 feet from the crossing until the impact. The speed of the bus is variously estimated at thirty-five to forty-five miles an hour; most of the witnesses estimating the speed at forty miles an hour; the bus driver said it was about thirty miles. As the bus came over the hill two automobiles were traveling west toward the crossing ahead of it. The occupants of these cars became aware of the approach of the engine and some cars on the spur track and both automobiles pulled to the north side of the highway and stopped; the one farthest to the west, and nearest the crossing, stopping about ninety feet from and east of the crossing. "All the way down the hill the bus driver was sounding the horn." Without any checking or slackening of speed the bus was driven down the hill, the distance of 500 feet, with horn sounding, at a speed of forty miles an hour, passed the two automobiles stopped ninety and 100 feet, respectively, east of the crossing and went onto the crossing into collision with the north end of the flat car which had emerged from the cut south of the highway and onto and across the pavement. None of the passengers on the bus seemed to have heard any signal from or to have seen the approaching engine and cars; their first discovery of the approach of the engine and cars being but an instant before the impact when the north end of the flat car emerged from the cut on the south side of the highway. The bus driver says he heard no signals; that he looked one time

both to the right and left as he was going down the hill toward the track but did not see the engine or cars; that the two automobiles traveling ahead of the bus stopped about halfway between the crest of the hill and the crossing but he thought they were merely "going to park there;" that when the front of the bus was only about twenty feet from the east rail of the track he "saw the flat car come out from behind the bank;" that he swerved the bus to the right in an attempt to avoid the on-moving car; that as the bus went over the track, at a slight angle, the right wheels were off the pavement and the northeast corner of the flat car was pushed into the left side of the bus striking it "right at the windshield." The bus continued across the track and the front of the bus struck and knocked down or broke off the post ($8\frac{1}{2}$ x $8\frac{1}{2}$ inches) supporting the railroad crossing sign, which was $17\frac{1}{2}$ feet west of the west rail of the track and $8\frac{1}{2}$ feet north of the north edge of the macadam. "The whole left side of the bus, from the driver's seat to the back wheel was torn out. Some of the passengers on the left side of the bus were killed" and plaintiff and his wife and all the other passengers on that side were injured. The bumper and the left front wheel and fender of the bus were broken. So far as the evidence shows this may have been caused by striking either the flat car or the crossing signpost. The windshield was about ten feet back from the extreme front part of the bus and if the flat car was pushed or jammed into the left side of the bus striking it at about the windshield, as stated by several of the witnesses, the conclusion is warranted that the damage to the front of the bus resulted from the striking of the signpost. The north wheels of the flat car were knocked off the rails to the west and onto the pavement. The brake staff of the flat car was bent to the west; the pin lifter was torn loose and bent in the same direction; "the northeast sill step was bent under the timber to which it was fastened;" paint from the side of the bus was found "on the lid of the journal box car;" and glass was "sticking in the ends of the floor boards" at the northeast corner of the flat car and pieces of broken glass were scattered over the floor of the car. There was much conflict in the evidence as to whether at the instant of the impact the flat car had been stopped and was standing still or whether it was moving northward and likewise as to how far north on the pavement the north end of the flat car extended. Plaintiff's witnesses and witnesses for the bus company generally agreed that the flat car had not yet been brought to a stop and was still moving northward at the instant of the impact and that after the collision the extreme north end of the flat car was "almost half way over in the north side of the pavement and within four feet of the north edge of the pavement" (the pavement was 16 feet wide); that it "was three-fourths of the way across the

pavement'' and five and one-half feet north of the center of the pavement. Some of appellant's witnesses said the flat car was stopped and standing still at the instant of impact. Most of appellant's witnesses who undertook to estimate the distance the north end of the flat car had advanced onto the pavement said it was north of the center of the pavement, some making an estimate of about two feet, while two of appellant's witnesses were of the opinion it was ''about the center of the pavement'' and ''approximately in the center of the pavement.'' Appellant claimed that the flat car was brought to a stop on the pavement with the north end at or south of the center of the pavement with ample space remaining on the north or right side of the pavement for the bus to have passed had it been driven on the right side of the pavement straight across the track. There was evidence on the part of the railroad company that the bus had not gotten back on the right side of the pavement after passing the two automobiles which had stopped 90 and 100 feet east and that as it neared the railroad track it was traveling in a northwesterly direction to get back on the right side of the pavement and ''dashed'' across the track at that angle so that the left side of the bus struck the northeast corner of the flat car which had then been stopped and was standing still. Appellant railroad company asked and the court gave an instruction directing the jury to return a verdict for the railroad company if the jury found and believed from the evidence that the flat car ''came to a stop so that the north end thereof was at or south of the center of Highway No. 50.'' On the other hand plaintiff's evidence, and that for the bus company, was that as the bus approached the track it was traveling upon the right or north side of the pavement and that the bus was swerved to the north in an effort to escape or avoid the flat car, the north wheels of the bus leaving the pavement, and that at a point about four feet from the north side of the pavement the flat car struck the left side of the bus at about and just below the lower edge of the windshield. The railroad company introduced into evidence a rule or regulation of the Public Service Commission requiring that the operator of a motorbus ''upon approaching a railroad crossing at grade shall slow down and bring the bus to a stop at a point clear of the railroad track and not more than 100 feet from it'' and ''ascertain'' that the ''way is clear before crossing.'' The switching crew claimed to be familiar with this rule and that they had seen busses stop before crossing this spur track. The bus driver testified he had lived in Sedalia for several years; that he had never observed any use of the spur track except at ''fair time'' when it was protected by a flagman, and that he had never stopped for that crossing. He also claimed to have known of the requirements of appellant's Rule 103b, supra. The foreman of the switching crew who,

as we have noted, was standing on the flat car and who says he could see and had a clear view of the highway from the crossing to the crest of the hill, testified, that he "first saw the bus as it came over the brow of the hill about 500 feet east of the track;" that he saw it "all the time;" that when he first saw the bus "it was coming down the road awful fast" and "seemed to be coming 'faster than the usual rate of speed" at which "these busses" approach that crossing; that he saw the two automobiles traveling west ahead of the bus "pull to the side of the road and stop;" that the bus did not slacken its speed as it came to that point and that the bus did not, at any time, after it came into view "over the brow of the hill" slacken its speed "until after it hit the flat car;" that when the northernmost end of the flat car was yet "forty to fifty feet south of the road" (south of the south side of the pavement or the south shoulder of the road or south side of the right of way?) realizing a collision was imminent he gave a "stop sign." According to the evidence most favorable to plaintiff, if we construe the statement that the north end of the flat car was then "forty to fifty feet south of the road" to refer to the paved portion only and recall the testimony that the north end of the flat car was only about four feet from the north side of the pavement at the instant of impact the flat car ran from fifty-two to sixty-two feet after the stop signal was given while construing the reference as being to the south shoulder of the highway it ran a distance of sixty-four to seventy-four feet after the stop signal was given. The railroad company's civil engineer in enumerating various measurements stated that the south edge of the south "shoulder" of the highway was twelve feet south of the south side of the pavement. Taking it that the foreman referred to the pavement and that the north end of the flat car was yet forty to fifty feet south of the south side of the pavement when he gave the stop signal the jury would be justified in view of all the testimony bearing on this phase of the case in adopting the higher estimate of fifty feet as more nearly approximating the distance and finding that the flat car thereafter ran a distance of at least sixty-two feet after the stop signal was given before it was stopped. If it had been stopped before the north end of the car crossed the center line of the pavement, under plaintiff's evidence, the bus would have passed safely over the track and that would be allowing a distance of fifty-eight feet in which to make a stop after the signal was given. The other switchman on the flat car also testified as to seeing the bus from the time it came over the brow of the hill and of its approach to the crossing with speed unchecked. This witness said that when the stop signal was given the "engineer immediately began to stop" and "the train came to a stop almost instantly;" that when the impact occurred the north end of the flat car was "near the center" of the

pavement and the flat car "was standing still or just about still." Plaintiff's expert witness, a former locomotive engineer with twenty years' experience in the operation of locomotive engines stated in reply to a hypothetical question embracing the existing conditions, the level, dry, track, the type of locomotive engine and kind of air and brake equipment used, the number and kind of cars and that the locomotive was pushing the cars and moving at a speed of between eight to ten miles an hour, that assuming the engineer was at his post, this engine and cars could be safely stopped "upon the usual passing of signals" in from six to eight feet. Three expert witnesses on the part of the railroad company in reply to a hypothetical question setting out the conditions existing and the giving of a signal by the switchman, respectively stated, that the engine and cars involved could have been safely brought to a stop within twenty-five feet "from the time" the engineer "first got the signal;" that the train described "should be stopped in from twenty-five to thirty feet after the signal calling for a stop is received by the engineer;" and "somewhere between twenty and thirty feet . . . from the time" the engineer "first got the signal." It is admitted that the engineer of the switch engine from his proper position in the engine cab could have seen the bus at all times after it came over the crest of the hill. The engineer testified, that as his engine moved north pushing the three cars through the cut south of the highway he was at his "proper place in the cab . . . on the right hand side of the cab with my arm on the arm rest looking out the side of the cars;" that he saw the bus "when it came over the brow of the hill," observed, "that it was coming down there fast" and "didn't slacken its speed any;" that when the north end of the flat car was "within a car's length of the crossing I glanced up the other way an instant and then looked back forward and was getting a signal from my crew to stop and my train was right against the crossing at the time it seemed to me . . . and it seemed to me like I stopped that train instantly" and the bus "shot across the track after I had just come to a stop."

The first point made by appellant is that the trial court erred in refusing its demurrer to the evidence offered at the close of all the evidence in the case "for the reason that it conclusively appears that the agents and servants in charge of defendant's train could not, by the exercise of ordinary care on their part, have brought the train to a stop in time to have averted the collision after the motor bus entered the danger zone." We have noted, supra, that at the time the demurrer to the evidence was offered failure to give the statutory crossing signals, by either bell or whistle, as a ground of negligence was yet a live issue in the case. But appellant's sole argument in support of its demurrer to the evidence is that the evidence did not

warrant the submission of negligence under the humanitarian doctrine. It overlooks the other issue, of primary negligence, which was submitted, failure to stop the engine and cars before crossing the highway or to send someone forward to flag or protect the crossing, and since we have determined there was substantial evidence justifying the submission of that ground of negligence to the jury we will consider appellant's contentions, "concerning the humanitarian doctrine under its assignment of error striking at the instruction given on that theory" (Mildred Homan v. Missouri Pac. Railroad Co., 334 Mo. 61, 64 S. W. (2d) 617), which is the next assignment of error appellant makes.

No complaint is made as to the form of the instruction submitting negligence under the humanitarian doctrine. It is said: "Plaintiff was not entitled to go to the jury under the humanitarian theory." Appellant's argument in this connection seems to ignore such parts of the evidence as is favorable to plaintiff and to have selected and presented such of the evidence as is most favorable to it. However, we must look to the whole of the evidence and if there is any substantial evidence giving rise to such issue then it was properly submitted. We have attempted at some length, and in perhaps unnecessary detail, to review the more pertinent parts of the evidence bearing on this phase of the case and we think there "is ground for a fair difference of opinion" on that issue and therefore a question for the jury. This same assignment supported by precisely the same arguments advanced here was made in the Mildred Homan case and disposed of adversely to appellant's contention by the decision of our Court en Banc in that case. Appellant says that the trainmen were justified in assuming that the bus would stop within 100 feet of the crossing, as the Public Service regulations required; that it would not enter the danger zone until it passed the 100-foot point east of the crossing without stopping; and that there was not sufficient time after it did come within that distance to the crossing to stop the cars and avoid the collision. However, "the duty of the trainmen did not as a matter of fact commence only after the bus entered the 100-foot zone. It commenced at such time as they saw, or could have seen, by the exercise of ordinary care, that the driver of the bus was intent on pursuing his journey across the track oblivious to the danger." [Mildred Homan v. Mo. Pac. Railroad Co., supra.] The facts in evidence as to the manner in which the bus came down the hill and approached the crossing, at all times within view of and seen by the trainmen, traveling as the switch foreman testified, "awful fast" and "faster than the usual rate of speed" at which "these busses" approach that crossing, with the horn sounding continuously and the driver apparently intent upon passing the two automobiles traveling ahead, without any checking or slowing of the speed of the

bus together with the evidence as to the distance within which the engine and cars, under the conditions there existing could be stopped, made an issue of fact for the jury as to whether the trainmen in the exercise of ordinary care could have discovered that the driver of the bus was oblivious of· the danger and intent upon pursuing his journey across the track, in time to, thereafter, with safety to· the train and crew, stop the engine and cars or slacken the speed thereof and thereby avoid a collision. The switch foreman said he realized that the bus was not going to stop and was coming onto the crossing and gave a stop signal while the north end of the flat car was yet forty to fifty feet south of the road. Appellant's argument is based largely upon the time and distance in which the engine and cars could be stopped after the ·engineer actually did see the stop signal which the switch foreman says he gave at that time and appellant contends that the evidence conclusively shows that the engineer stopped the engine and cars as soon as he could have stopped them after he did see the stop signal. The engineer looked away and when he again looked back toward the north and east the switch foreman was giving the stop signal and the inference is warranted that had the engineer been then giving attention to the situation he would have seen the stop signal when it was first given and when the north end of the flat car was yet fifty-eight feet, or farther, south from the center of the pavement and in time, according to the testimony of appellant's own experts, to have stopped before the north end of the flat car reached the center of the pavement; nevertheless if appellant's contention that the evidence shows that the engineer stopped the drag of cars as soon as he could after he actually saw the signal be granted and allowed as sound that does not settle the matter. The engineer could have seen the bus at all time after it came over the crest of the hill. He did see it when it first appeared over the "brow of the hill" and saw it coming ·down the hill toward the crossing at a fast rate of speed without any slowing or checking of speed but he turned his attention from the on-coming bus and looked in another direction. When he did look back the switchman was already giving the stop signal. "Appellant's argument· overlooks the fact that it was the duty of the engineer, as well as the switch foreman, to look out for the bus, or any other vehicles on the highway. He was operating the switch engine, and had the means of stopping at hand. If he saw, or could have seen, by the exercise of ordinary care, that the bus driver, oblivious to the danger, was intent on pursuing his journey across the track, it was· his duty to act, without waiting for any one else to tell him to act. .From his own testimony the jury were justified in believing that he was negligent in taking his eyes off of the bus when he saw it speeding toward the crossing, that he looked away too long, and that, by the exercise of ordinary

50

care, he could have observed the bus coming into a place of danger in time to have stopped the cars and avoided the collision." [Mildred Homan v. Missouri Pac. Railroad Co., supra.]

By basing its attack upon the instruction on the ground that the evidence does not warrant or justify the submission of that issue appellant in effect concedes that the instruction submitting negligence under the humanitarian rule is a correct statement of that doctrine but adds under its points and authorities, though it does not pursue the matter in its argument, that the court erred in giving same because the term "'ordinary care" is not defined therein nor in any other instruction given in the case. The appellant does not claim the instruction erroneously states the humanitarian rule and if it thought the term "ordinary care," which was properly used therein, should be explained to the jury it should have asked an instruction defining such term.

Appellant makes the same complaints of error in the giving of plaintiff's instruction authorizing a finding against appellant on the charge that, under the conditions there and then existing, the exercise of ordinary care required that the engine and cars be stopped before crossing the highway or "someone . . . be sent forward to flag or protect the crossing," which it made against the same instruction in the Mildred Homan case. Our opinion in that case necessarily rules the point. There the same objections here made are fully discussed, authorities cited and quoted and our conclusion stated as follows:

"In light of these authorities and the evidence in this case that there was an obstruction of the view at the crossing, by the contour of the field, the embankments, the weeds and fences, that the track was a switch track not used by regular trains, and that there was a very great amount of travel on the highway, we hold it was proper to permit the jury to pass upon the question of whether the crossing was so unusually dangerous and hazardous as to require the railroad to do something more to warn travelers, of the approach of switch engines and cars, than to merely give the statutory crossing signals. Likewise, in view of the railroad company's rule, requiring a member of a switching crew to flag grade crossings, when yard switching movements were being made, in view of the conflicting evidence as to whether or not this was a yard movement, . . . and in view of the fact that one of the switchmen was left to await the return of the switch engine and cars, within a quarter of a mile of this crossing with nothing to do except to sit around and observe whether or not a particular passenger train passed on the main line; we hold that it was proper for the jury to say whether or not ordinary care required that some one of the switching crew flag or protect the crossing before the switch engine and cars crossed it. So far as the

use of the words 'railroad management' is concerned, the real question is whether ordinary care required this precaution rather than whether 'railroad management' required it, and that was the real question the instruction required the jury to pass upon. The same objection to the use of the words 'that railroad management in the exercise of ordinary care required' that the crossing be flagged, was made and overruled in the case of Toeneboehn v. St. Louis-San Francisco Ry. Co., 317 Mo. 1096, l. c. 1116, 298 S. W. 795, l. c. 804. That case, like this one, was a much-traveled crossing near but outside city limits."

█ It is not charged, nor is there any evidence tending to show, that plaintiff was negligent in any manner whatsoever and the negligence of the bus driver cannot be imputed to plaintiff, a passenger, to bar recovery by plaintiff under either charge of negligence.

█ Appellant offered as a witness a garage owner and automobile dealer at Sedalia who pperated an automobile repair shop in connection with his business who testified, that he was experienced in the examination and repair of "wrecked automobiles;" that he examined the bus and flat car and inspected the ground at the scene of the collision, after the collision, and observed the damage to the bus and flat car. Appellant then sought to prove by the witness that "he was able to tell that at the moment of impact the bus was headed in a northwesterly direction; that the bus struck the flat car south of the north end of the flat car and that the side of the bus then "plowed through the corner of the bus." The trial court refused the offer of proof and appellant assigns that ruling as error on authority of Patrick v. Steamboat J. Q. Adams, 19 Mo. 73. This same offer of proof was made and refused in the trial of the Mildred Homan case and appellant's contention in reference thereto is disposed of adversely to it in our decision in that case. And as this case presents the same situation, as to this proferred evidence, we adopt and follow our ruling in that case. We there discussed the Patrick case.

█ The complaint that the trial court erred in excluding an answer filed by appellant's codefendant, the bus company, in proceedings before the Public Service Commission in which it stated that it had instructed all its drivers to stop within 100 feet of all railroad crossings and that it had discharged the driver of the bus, which answer or statement appellant sought to introduce in evidence, was likewise passed upon in the Mildred Homan case and appellants claim of prejudicial error committed against it disallowed.

The refusal of the trial court to give instructions numbered 4a, 16, 17 and 18, offered by defendant railroad company is assigned as error.

█ By its Instruction 4a appellant requested the trial court to instruct the jury that under the rules of the Public Service Commission it was the duty of the owner of the bus to have the bus equipped

with brakes of sufficient power to bring the bus to a complete stop within forty-five feet of the point at which the brakes were applied; that the trainmen had a right to presume that the bus was so equipped and that the brakes would be applied and the bus stopped before reaching the crossing; that there was no duty on the trainmen to bring the cars to a stop until after the bus had passed such point that it could not by the application of the brakes required by law be brought to a stop before reaching the crossing; and that if the jury found that after the bus had passed such point the trainmen then used reasonable care to slacken the speed or bring the cars to a stop the verdict should be for defendant railroad company.

Appellant's Instruction 17 would have the court instruct the jury that the trainmen "had a right to presume" that the bus would be brought "to a complete stop before reaching the railroad crossing . . . and this presumption continued until" the bus passed a point 100 feet east of the railroad track at such speed "as would cause a person in the exercise of ordinary care to believe" that bus was not going to stop at the crossing; and that if the jury found that after the bus passed said point 100 feet east of the track the trainmen then "used ordinary care to bring" the cars to a stop "the verdict must be for defendant" railroad company. The mere statement, we have made, of the substance of the two foregoing instructions would seem sufficient to demonstrate that the trial court properly refused to give same. The instructions are directed solely to the issue of negligence under the humanitarian rule and ignoring primary negligence also submitted by plaintiff's instruction authorize and direct a verdict for the defendant railroad company upon the finding merely that the trainmen "used ordinary care" to stop the cars or slacken the speed thereof after the bus passed a certain point which the instructions undertake to fix. These instructions, in effect, tell the jury that though the engineer and switchmen saw the bus coming down the hill and approaching the crossing in the manner and under the circumstances shown by the evidence nevertheless they were under no duty to take heed of the appearance or to follow the dictates of ordinary prudence until after the bus passed a fixed line or point which the appellant would have the court, by instruction, fix. The instructions direct the jury to disregard all the facts and circumstances in evidence as to the manner in which the bus came down the hill toward the crossing and consider only what occurred after the bus passed the points fixed. Appellant thus sought to have the court fix the limits in feet and inches, and as a matter of law, within which the duty devolved upon the trainmen to thereafter take notice of the approaching bus and the indications arising from the manner in which it was being driven and to have the court advise the jury, in effect, that even though the manner in which the bus

speeding over the crest of the hill and down the hill toward the crossing was such as to apprise a person of ordinary prudence that the driver was either unaware of the approaching cars, or recklessly indifferent thereto, and intent upon proceeding across the track nevertheless the trainmen were under no duty to give heed thereto or take any action until after the bus reached and passed one of the points designated in the instruction. In speaking of appellant's contention that no duty rested upon the trainmen under the humanitarian rule until after the bus passed the 100-foot mark we said in the Mildred Homan case: "The duty of the trainmen did not, as a matter of law, commence only after the bus entered the 100-foot zone. It commenced at such time as they saw, or could have seen, by the exercise of ordinary care, that the driver of the bus was intent on pursuing his journey across the track, oblivious to the danger." ■ Appellant's refused Instruction 18 would have advised the jury that appellant had a right to presume that the bus would be driven on the north side of the road and that if appellant stopped its cars at or south of the center of the crossing leaving sufficient room for the bus to pass on the north side of the road the verdict should be for railroad company. Assuming, without discussing, that the instruction was sufficient in form and substance and a proper instruction in the case nevertheless defendant could not have been prejudiced by its refusal as the court gave appellant's Instruction 13 to the same effect which told the jury that "if the flat car . . . came to a stop so that the north end thereof was at or south of the center" of the pavement "then your verdict will be for the defendant" railroad company. No error was committed in refusing appellant's instructions 4a, 17 and 18.

■ By its refused Instruction 16 appellant sought to have the court instruct the jury that if they found from the evidence "that the operator of the motorbus . . . in approaching the crossing, by the exercise of the highest degree of care, could have seen" the cars "in time," by the exercise of the highest degree of care, "to have stopped" the bus and "avoided" the collision and that he failed "to use said degree of care to discover said" cars "and that such failure of the operator of said motorbus to use such care was the proximate and sole cause of the injury to plaintiff" then the verdict "must be for defendant" railroad company. The trial court, as we have held properly submitted the case as against the railroad company, this appellant, on one ground of primary negligence and on negligence under the humanitarian rule authorizing the jury to find against the railroad company if such negligence on its part "directly caused or contributed to" plaintiff's injuries. As to the bus company plaintiff's instruction told the jury that if the operator of the bus "failed to exercise the highest degree of care in the operation"

of the bus "and negligently and carelessly caused and permitted" it "to collide" with the railroad cars then the bus company "was guilty of negligence and is responsible to plaintiff for damages resulting to him from such negligence." Other instructions clearly authorized the jury to find against either or both defendants or for one defendant and against the other or for both defendants as the jury found the facts to be. On the part of appellant railroad company the court gave a very explicit instruction (No. 15) telling and cautioning the jury that plaintiff charged the railroad company with negligence; that negligence "is a positive wrong and in this case is not presumed;" that the jury should not "summarize or conjecture from the mere fact" there was a collision and plaintiff was injured that the railroad company was "guilty of any negligence;" that for plaintiff to recover against the railroad the charge of negligence made against it must be sustained by a preponderance of the evidence (defining that term) to the "reasonable satisfaction of the jury that the charge is true as laid and it does not devolve upon" the railroad company "to disprove the charge, but rather, the law casts the burden of proof thereof upon the plaintiff," reiterating that such charge "must be sustained by the preponderance (again defining term) of the evidence to the satisfaction of the jury;" and that if the evidence "touching the charge of negligence against" the railroad company be "evenly balanced, or the truth" as to such charge "remains in doubt in your minds . . . your verdict must be for defendant" railroad company. Instruction 16 seems to have been an attempt on the part of the railroad company to invoke the doctrine of last clear chance as between the bus company and itself as a defense to plaintiff's action against it. The bus company was a codefendant; plaintiff charged both the bus company and the railroad company as joint tort-feasors. It neither constituted nor afforded a defense on the part of the railroad company to plaintiff's charge of negligence against it under humanitarian rule that the bus driver could, by the exercise of proper care, have seen the railroad cars in time to have stopped the bus before reaching the crossing. It was unquestionably shown that the bus driver was negligent but the negligence of the driver of the bus could not be imputed to the plaintiff nor was any negligence on the part of plaintiff involved in the case and the issue of the railroad company's negligence under the humanitarian rule, as submitted by plaintiff's instruction, remained. Appellant's only defense on that issue "was to disprove one or more of the basic facts" on which the humanitarian rule rests. [Millhouser v. Kansas City Public Service Co., 331 Mo. 933, 55 S. W. (2d) 673.] The evidence establishes that the failure of the bus driver to exercise the proper degree of care to discover the approach of the railroad cars was a proximate cause of the collision but there was sufficient and substantial evidence that

negligence of the railroad company proximately contributed to the collision and the facts tending to establish that were predicated and submitted in plaintiff's given instructions which with appellant's given instructions fully advised the jury that unless they found that appellant was negligent, as submitted, and that such negligence proximately contributed to, or concurred with the negligence of the bus company, to cause plaintiff's injury their verdict should be in favor of the railroad company and the direction concerning a finding of sole cause included in this instruction would not serve to enlighten the jury but rather tends to confuse or mislead. [Millhouser v. Kansas City Public Service Co., supra; Peppers v. Railroad Company, 316 Mo. 1104, 1114, 295 S. W. 757, 761; Boland v. Railroad, 284 S. W. 141, 145; Smith v. Railroad, 321 Mo. 105, 9 S. W. (2d) 939, 946.] Under the facts and circumstances in evidence in this case and in view of the instructions given appellant's Instruction 16 had no place in the case and the trial court was not in error in refusing same.

■ Appellant's "points and authorities" lists an objection that the trial court erred in admitting testimony "as to the number of trains which passed over the spur track." The specific testimony complained of is not pointed out. As we recall there was testimony to the effect that, except at State Fair time, the spur track was seldom used. The record however shows an admission by appellant's counsel that trains are run only "at infrequent intervals" over that track. We find no merit in the point.

■ It will be recalled that the first count of the petition was based upon personal injuries which plaintiff sustained and the verdict thereon was for $25,000; and that on the second count for damages for loss of services, assistance and consortium of plaintiff's wife together with expense of medical and nursing care in her behalf the verdict was in the sum of $20,000. The first count does not allege loss of wages as an element of damages but does state that plaintiff's "earning capacity has been permanently impaired." The evidence was that plaintiff was employed by the Harbison Manufacturing Company of Kansas City, in charge of the radio department, at a salary of $175 per month; that on account of the injuries sustained in this collision he was absent from his work for approximately ten weeks; that his employer paid him his regular salary for that time and that he thereafter returned to his regular employment at the same salary theretofore paid; and that he had since been employed by that company in the same position at that salary to the time of the trial. The court instructed the jury at appellant's request, "that there is no evidence that plaintiff has lost any earnings as a result of any injuries he may have sustained." Under points and authorities appellant states:

"The verdict of the jury on both counts of the petition was highly excessive and the court erred in permitting the verdict to stand. (Citation of authority unnecessary.)"

In its statement of facts appellant makes no reference whatsoever to the evidence relating to plaintiff's injuries nor the evidence touching the allegations of the second count. In its argument it hands us this assignment with the mere statement that: "The verdict in this case is highly excessive. While the record discloses that plaintiff received serious injuries it likewise discloses the fact that he responded to treatment;" that "he has for some time been engaged in the same occupation as that in which he was engaged before the accident, drawing the same salary;" that "he has lost nothing in the way of salary;" and that, "while plaintiff's wife was seriously injured . . . there was nothing in this record to justify a verdict of $20,000" on the second count. ". . . This court has many times refused to permit a judgment for such an amount to stand but as this question must be determined from the records in each case we shall not prolong the argument by a citation of authority." It appears that the only specific complaint made against the amount of damages assessed on the first count of the petition is that it was shown plaintiff "has lost nothing in the way of earnings." In view of the court's instruction we must assume that such item was not considered by the jury in assessing the damages. Appellant's presentation of this assignment, which we have set out, affords us but little assistance. However, we have carefully read the testimony of the medical experts and lay witnesses relating to the injuries sustained with a view to determining whether the amount of the verdict is, as appellant seems to suggest, patently excessive. The defendants offered no testimony on the subject; they did not have an examination made and plaintiff's evidence is not controverted. We shall first consider the injuries which plaintiff sustained. the basis of the first count. At the time of the collision plaintiff was of the age of thirty years. Prior to that time he had been of robust physical health; a strong, vigorous, healthy, able-bodied man. There is evidence that plaintiff suffered an injury to the base of the skull and "concussion of the brain and endocrin glands;" there were lacerations about the face and head, requiring "ten stitches for closure" leaving his face permanently scarred and disfigured. He had a fracture of the seventh rib. There was a "comminuted fracture of the left shoulder and arm." The fracture was "up in the ligaments of the joint" and the doctors testified they were unable to get a satisfactory reduction and "never would be able to do so." The testimony was that he "has an impacted shoulder;" that the "fracture is so high and so close up under the base of the joint, the ball of the joint and socket was injured." There is "a certain amount of ankylosis" and

the muscles, ligaments and nerves are injured. The left arm has shortened; any attempt to use the left arm is extremely painful and he has a very "limited use of that shoulder and arm." "The whole arm is atrophied and it will continue to get smaller." The "area over the heart region was greatly bruised." The testimony of doctors and medical specialists and experts who had treated plaintiff and from time to time and recently before the trial made a physical examination was that he had a "very bad heart condition;" that he has "an injury back of the heart" and "the heart muscle itself is affected;" that tests made under the most favorable conditions of quiet and rest show the heart action accelerated. "As a result of a disturbance of the co-ordinating mechanism of the eye or cessation of the function of the nerves the left eye shows imperfect rotation of the eyeball upward . . . so that he gets a lower vision with the left eye than he does with right and causes double vision at times." Plaintiff has some muscular tremor; he is anaemic, "extremely weak," and the slightest physical exertion causes "extreme fatigue;" there is a "disfunctioning of the thyroid gland and heavy thyroidism." Plaintiff's equilibrium is "faulty" and sense of balance affected so that at times he is somewhat unsteady in his walk and "even in standing." "The right side of his face has suffered a degree of facial palsy." He has lost much weight and is extremely nervous. He was taken from the scene of the collision to a hospital in Sedalia where he remained five or six weeks. One of the doctors testified that plaintiff's suffering and pain was so intense that it was necessary to administer morphine during the whole time he was in the hospital. The doctor who first treated him and who had charge of the case during the time plaintiff remained at the Sedalia hospital testified that plaintiff "doesn't look as well as he did when he left the hospital." The testimony was that the injuries described were permanent; that plaintiff "never could recover his health;" that "it would be impossible to ever fully recover." At the Sedalia hospital plaintiff paid $418 for medical and nursing services for himself. He had been under treatment at times by physicians since. While plaintiff had resumed his former employment as a salesman in the radio department of the Harbison Company, it was stated by his superior in that business that plaintiff's capacity and efficiency had been impaired. While loss of earnings was not submitted to the jury, the instruction on damages did submit "impairment of his earning capacity, if any," as one element which the jury might consider in assessing damages on the first count. After an absence of ten weeks from his work, on account of the injuries he sustained, plaintiff resumed his regular position or employment and had since worked steadily thereat at the same salary received prior to his injury. One of his superiors in the business stated that plaintiff's efficiency had

been impaired. The extent of impairment in his future earning capacity is however largely speculative. It is true, that on account of the arm and shoulder injury he was doubtless physically unfit for manual labor but it does not appear that his injuries had physically or mentally incapacitated him to earn a livelihood or pursue his former occupation or some similar line of work. Of course in considering the amount of damages allowed, the other elements involved must be accorded due and proper consideration, such as pain and suffering endured and to be endured, "the right itself to health and a normal body, which has been impaired, and hospital and medical expense. [Bond v. St. Louis-San Francisco Ry. Co., 315 Mo. 987, 288 S. W. 777.] The character and results of plaintiff's injuries are such that it is difficult to accurately measure the assessment of damages and as we have often said there are no fixed rules or standards by which courts can be governed in assessing damages for personal injuries. The amount of damages allowed, in such cases, is dependent upon, and must be considered in the light of, the facts of the particular case. However we have concluded that, on the whole, the verdict on the first count is excessive by $5000. ▌

The injuries suffered by Mrs. Homan were so numerous and of such a serious character that we will not attempt to enumerate them in detail here; suffice it to say the evidence shows that whereas she was prior to the time these injuries were sustained, a woman of the age of twenty-four years, in good health, strong and able bodied and she was left, as a result of this tragic event, disfigured and crippled and in a condition of semi-invalidism. One doctor testified: "Every organ in her body is disfunctioning." Since the time she was injured she has had, must now have and will continue to require medical care and treatment. Certain further operations, of a major character may become necessary. The medical testimony seems to close the door of hope for recovery or restoration to normal conditions of body and health. She is confined to her bed for varying periods of time and suffers and will continue to suffer pain. Plaintiff paid approximately $700 for medical and nursing services for his wife at the Sedalia hospital where she was first taken and where she remained for ten weeks. He has since and must in the future provide necessary medical treatment for her. On account of these injuries and the permanent results thereof the wife is unable to regularly perform ordinary household duties or contribute to the marital relationship, the companionship, consortium, helpfulness and aid of which she was capable, and which was her portion, before she was injured. In Furnish v. The Mo. Pac. Ry. Co., 102 Mo. 669, 15 S. W. 315, discussing appellant railroad company's complaint that the trial court erred in instructing the jury to allow plaintiff "such

sum as the evidence showed would compensate him for the 'loss of society and companionship of his wife,' '' this court said:

"The objection is placed upon two grounds. It is first asserted that there was no loss to plaintiff of the society or companionship of his wife, because, though injured, she was yet with him and he therefore had the benefit of her society. But the answer to that contention is that, as her husband, he was entitled to her society as she was when the negligence of defendant impaired her strength, her health and her usefulness as a helpmate. Though he may still be with her and her companionship may be even more dear to him since her injury, because of her very helplessness and need of his attention, yet that does not diminish the legal wrong he has suffered from the acts which produced that condition. He is entitled to be compensated for such loss of her society as resulted from the negligence alleged.

"By the term 'society' in this connection, is meant such capacities for usefulness, aid and comfort as a wife, which she possessed at the time of the injury. Any diminution of those capacities, by the acts or negligent omissions of defendant, constituted a just basis for an award of compensatory damages therefor. (Cases cited.)

"Next it is urged that, as no evidence was offered of the value of the wife's society, the instruction should not have been given. To this it may be said that the nature of the subject does not admit of direct proof of value and that, when the fact of loss of society is established by testimony, the assessment of reasonable compensation therefor must necessarily be committed to the sound discretion and judgment of the triers of fact."

By the instruction on the damages which the jury might assess on the second count the court instructed that if the jury found for plaintiff "to assess his damages at such sum as you believe and find from the evidence to be a fair and reasonable compensation to him for the diminution, if any, and impairment, if any, to him of the society, assistance and domestic services of his wife and expenses for hospitals and medical attention reasonably incurred or expended by him . . . or which it is reasonably certain from the evidence he may hereafter be required to expend or incur, if any, on account of her injuries . . . and the reasonable certainty, if any, of such diminution, . . . and impairment . . . continuing in the future." The jury were authorized in assessing damages to take into consideration the elements of damage enumerated in the instruction and as appellant has made no complaint of the instruction here we take it to be conceded that such elements were properly submitted. Appellant's statement in his argument relating to the verdict on the second count (quoted supra) that, "this court has many times refused to permit a judgment for such amount to stand" has challenged our attention. Appellant does not cite any case and though, for the

purpose of comparison, the writer has endeavored to find the cases referred to he has been unable to do so. However, by reference to precedent, we note that the amount of damages allowed herein on the second count is greatly in excess of any recovery had on a similar cause of action in this State, so far as the writer has discovered, but it must be conceded that the facts in this instance present a more serious situation than appears in any of our cases, which the writer has examined, and justify a substantial allowance. Nevertheless we are of the opinion that the verdict on the second count is excessive by $7500.

If therefore the plaintiff will within ten days enter a *remittitur* of $12,500 the judgment will stand affirmed for $32,500 as of the date of the original judgment; otherwise, the judgment will stand reversed and the cause remanded for a new trial. *Sturgis* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.*, absent.