STATE OF MISSOURI, Respondent, v. ULAS QUILLING, Appellant, No. 43317—256 S. W. (2d) 751.

Court en Banc, March 9, 1953.

Rehearing Denied, April 13, 1953.

*Kenneth K. Simon* for appellant.

1018

*J. E. Taylor*, Attorney General, and *John S. Phillips*, Assistant Attorney General, for respondent.

**LEEDY, J.**—Ulas Quilling was tried for the murder of Lauvenia Julia Webb, convicted, and sentenced to the extreme penalty in accordance with the verdict. He has appealed, assigning as errors: (1) That the court should have directed a verdict of not guilty "by reason of insanity;" (2) Improper admission of evidence; (3)

Failure to instruct upon all questions of law arising in the case; (4) Prejudicial argument by the prosecutor; (5) Improper consideration by the jury of parole practices; and (6) Arbitrary rejection by the jury of opinion evidence. Under these assignments it is unnecessary [752] to make an extended statement of the facts, their sufficiency to support the verdict not being challenged otherwise than under point (1). As will presently be seen, the latter is limited to the question of whether, on the issue of insanity, the opinion of a psychiatrist (called on the part of Quilling, and the sole expert on that issue) was binding and conclusive so as to require that the court direct a verdict of acquittal, as requested.

Appellant (to whom we shall refer as defendant) together with the other principals and most of the witnesses (police officers and physicians excepted) were Negroes. Lauvenia, the deceased, whom defendant admitted having shot and killed, was his paramour. The killing occurred in the early morning hours of May 19, 1951, and climaxed a night of drinking, in which defendant, deceased and a number of others participated at the apartment of Roy Johnson at 1100 Paseo in Kansas City. Among those present at the drinking party was Lauvenia's friend and associate, Irene Bragg. The evidence showed that defendant went to the Johnson apartment about 9 P. M., May 18, and, after first showing some reluctance "to join the party" (apparently because Lauvenia had somewhat "slacked off" their relationship, to his displeasure), did later begin drinking, and by his own admission bought nine quarts of beer while there. He sought to persuade Lauvenia to go to their home (they had been living together), but she declined, and suggested the next evening as an alternative. From defendant's confession it appears that while still at the party, and at about 2:30 A. M., he "heard some man's voice over the phone talking to Lauvenia, who I knew was not her husband's voice and she tried to tell me that it was her husband wanting her to come down to Elks Rest where he was. [Defendant asked her to let him take her down there.] And so she wouldn't agree to that and that's what made me angry as I knew she was up to something * * * so that's when I went home and got my revolver." She had told him she was going in a cab. It is not clear whether, upon returning about 5 minutes later, defendant re-entered the Johnson apartment, or whether he waited outside until Lauvenia and Irene came out onto the sidewalk, as they did, in answer to the honking of a car or taxi driven by the state's witness Hudspeth in which Carl Dobbs was a passenger, which car had just driven up and double-parked in front of 1100 Paseo. Irene got into the car, but defendant took hold of Lauvenia's arm and told her not to, but "to come on home." She started to comply, then apparently changed her mind and started back to the car, and when she did so, defendant shot her in the abdomen, from the effects of which she died shortly

after arrival at the hospital to which she was immediately taken. It was developed, as a part of the res gestae, that defendant also shot and killed both Irene Bragg and Carl Dobbs at the same time and place. His defenses were self-defense and insanity. Other facts will be stated in connection with the points to which they relate.

The contention that the court should have directed a verdict of not guilty "by reason of insanity" grows out of the testimony of an admittedly qualified psychiatrist (called by defendant), who gave it as his opinion, based upon a psychiatric examination (the details of which were enumerated), that defendant was of the mental age of between 6 and 9 years, and that because of his psychosis, defendant did not understand right from wrong. The essence of the contention is that in the absence of countervailing *expert testimony* (and admittedly there was none), the opinion evidence of the psychiatrist was conclusive on the insanity issue, and entitled defendant to a directed verdict of not guilty. We have been cited to no authorities so holding, either here or elsewhere, nor have we been able to find any. The rules governing opinion and expert testimony are the same in criminal cases as in civil. And the settled doctrine is that "the testimony of experts is to be considered like any other testimony, is to be tried by the same tests, and receive just so much weight and credit as the jury may deem it entitled to when viewed in connection with all the circumstances * * *." Scanlon v. Kansas City, 325 Mo. 125, 150, 28 S.W. 2d 84, 95. The rule is not different even though expert evidence be uncontradicted. [753] For example, see State v. Stapp, 246 Mo. 338, 340, 151 S.W. 971, 972-973, an abortion case, where it was said: "We are confronted with the fact that the abortion did not occur until four weeks after the alleged use of the instruments. The expert testimony was *all* to the effect that such result would not follow after so long a time. *The jury were not necessarily bound by the expert evidence, and had the right to find that the abortion was caused by the use of the instruments notwithstanding such expert evidence.*" (Emphasis supplied.) See, also, State v. Recke, 311 Mo. 581, 595, 278 S.W. 995, 999; State v. Liolios, 285 Mo. 1, 225 S.W. 941; Hall v. Mercantile Trust Co., 332 Mo. 802, 820, 59 S.W. 2d 664, 672; 32 C.J.S., Evidence §569(h); 20 Am. Jur., Evidence §1208.

On the related point that the jury arbitrarily rejected the opinion evidence in question, for which reason the court should have granted a new trial, it is sufficient to add this to what has already been said: That the court and jurors had an opportunity to observe defendant's conduct and demeanor throughout a two-day trial. The transcript of his examination covers more than 40 pages, thus indicating he was on the witness stand for perhaps an hour and a half. In addition to the defendant's 5-page written confession, made at 9 A. M., May 19, a wire recording of a statement made by him to the police about 2 P. M., on the same day was "played back." These were matters

having a marked tendency to throw light on the insanity issue, and so the jury had a right to consider them in determining that issue; and if found to outweigh the opinion evidence, it was within the jury's province to reject the latter. In this situation, it cannot be said that the error complained of has been made to appear.

 The assignments complaining of the improper admission of evidence are directed principally to defendant's written confession and the wire recording to which reference has just been made, the point being that references therein to the shooting of Irene Bragg and Carl Dobbs should have been excluded in both instances. By stipulation the wire recording has been omitted from the record, so we are without means of knowing its contents; but insofar as the question raised has to do with the wire recording, it is not legitimately open to defendant because of the following record made at the time the wire recording was offered:

"Mr. Simon [defendant's counsel] : If your Honor will instruct the jury to disregard the portions relating to the other crimes not here on trial, then I will have no objection.

"The Court: Very well. Gentlemen of the jury, as you know, this trial is for the alleged murder of the Webb girl, and if there is anything in this wire recording that relates to any other possible crime or homicide, you will be instructed to disregard that and confine your appraisement of the evidence insofar as it applies to the alleged murder of Lauvenia Webb. Is that satisfactory?

"Mr. Simon: Yes, your Honor."

No objection was interposed to the confession until the prosecutor, in reading it to the jury, reached that portion which immediately followed the delineation of the circumstances under which he had shot Lauvenia, e. g.," * * * and the other woman, Irene, ran twixt me and Lauvenia and that's when Irene got shot." Defendant then moved that the quoted portion "be stricken * * * and the jury be instructed to disregard it, and that any portion * * * that does not relate to this crime with which he is charged be not read into evidence." This was overruled, and the prosecutor continued to read, thus: "I kept firing the gun, when the man jumped out of the car, I figured he had a gun, and that he was going to shoot me, and I shot him. I don't know if he had a gun. I didn't see him have a gun before I shot him. Q. How many times did you shoot? A. I think it was five."

The point must be ruled against defendant. The offending portions were admissible on the same principle that independent evidence to the same effect would have been; that is, as part of the res gestae. In State v. Bell, 359 Mo. 785, 788, 223 S.W. 2d 469, 471, defendant was convicted of murder [754] in having killed Neaves, a policeman. On appeal he complained of the admission of evidence

as to the killing and wounding of others at the same time and place. In ruling the question, this court, en banc, in an opinion by Judge Clark, said: ''This evidence was properly admitted as a part of the res gestae. It did not relate to separate and distinct crimes, but parts of a continuous occurrence intimately connected with the crime for which defendant was being tried. State v. Brinkley, 354 Mo. 337, 189 S.W. 2d 314; State v. Mangercino, 325 Mo. 794, 30 S.W. 2d 763.''

Another point has been briefed based on the supposed misconduct of a rebuttal witness in ''blurting out an answer'' to a question (touching defendant's mental state) after the court had sustained an objection to the question. We do not discuss it because the transcript fails to show that the incident occurred, an omission to which the state's brief called attention, and no reply thereto has been filed.

There is nothing in the further contention that the court was required to instruct the jury, as a part of the law of the case, and without request, to consider defendant's prior manslaughter conviction in Mississippi only as affecting his credibility. State v. Miller, (Mo.) 292 S. W. 440; State v. Broaddus, 315 Mo. 1279, 289 S. W. 792; State v. Aurentz, 315 Mo. 242, 286 S. W. 69; State v. Davis, (Mo.) 267 S. W. 838.

Numerous assignments are directed against the prosecutor's argument, both opening and closing. The transcript discloses that certain of those portions now vehemently urged as grounds for discharging the jury were not objected to at the trial, in consequence of which they are not now open to review. Indeed, it appears that only two objections were made throughout the prosecutor's arguments; one in the opening, the other in the closing. In each instance the court took the action requested by defendant's counsel, either by sustaining the objection and striking the offending matter, or by directing the prosecutor to ''stick to the evidence,'' and admonishing the jury to ''be guided by the evidence in the case, and by these instructions.'' No other or further action was requested, or even suggested, thus indicating defendant's complete accord with the court's rulings, hence forestalling the complaints now sought to be urged. Nevertheless, because of the nature of the case and the severity of the punishment, we take occasion to say that even if properly preserved for review, the presently challenged argument would not have constituted reversible error.

The remaining assignment is that the jury should have been discharged because it was improperly permitted to consider parole practices. The point is founded on this incident: After having deliberated on a verdict (the precise time does not appear) the jury returned into court for the purpose, as declared by the foreman in the presence of his fellows, ''of a clarification of the instructions and to find out certain versions of the instructions in regard to sentence.'' Reduced to its ultimate and simplest terms, the point of inquiry was

"if an assessment [of punishment] is made, if that penalty, after a period of time can be deviated from." The court's reply and the foreman's rejoinder (following which the jury again retired to resume its deliberations) were:

"The Court: Well, that is the penalty, whatever you assess is the penalty. Now, what happens after that, you can't consider and go into yourselves, you just have to assess the penalty at whatever, if you have in mind assessing a penalty, whatever you are going to decide to do. Now, whatever comes of it after that is something that you are not privileged to have anything to say about or go into further.

"The Foreman: That answers the question. That is what we want to find out."

Defendant's counsel was admittedly present at the time of this occurrence, but apparently he did not regard the incident as prejudicial because no objection was interposed to what transpired. In this situation, and bearing in mind that the information thus transmitted is not charged to have been incorrect, the court was under no duty to discharge the jury and declare a mistrial [755] on its own motion for a mere irregularity, as this incident must be regarded.

The record proper has also been examined, and found to be sufficient. From the whole record it appears that defendant had a fair and impartial trial, and error to the prejudice of his rights not having been made to appear, it follows that the judgment must be, and it is, affirmed. All concur.