Larry TENNIS,
Plaintiff-Respondent-Appellant,

v.

GENERAL MOTORS CORPORATION,
Defendant-Respondent,

and

Universal Tool & Stamping Company,
Inc., Defendant-Appellant.

Nos. 11907, 11910.

Missouri Court of Appeals,
Southern District,
Division One.

Nov. 24, 1981.

Thomas G. Strong, Mathew W. Placzek, Strong & Placzek, P.C., Springfield, for plaintiff-respondent-appellant.

Donald R. Duncan, Turner, Reid, Duncan & Loomer, P.C., Springfield, for defendant-respondent; Otis M. Smith, Gen. Counsel, General Motors Corp., Detroit, Mich., of counsel.

Glenn A. Burkart, Bruce E. Hunt, Mann, Walter, Burkart, Weathers & Walter, Springfield, for defendant-appellant.

TITUS, Judge.

Plaintiff sued General Motors Corporation (General Motors) and Universal Tool & Stamping Co., Inc. (Universal) for damages resulting from personal injuries received when a Chevrolet Caprice automobile, on which he was installing shock absorbers, fell as the result of an allegedly defective bumper jack manufactured by Universal and furnished by General Motors. Plain-

tiff's claims were predicated on defendants' strict liability per § 402A, 2 Restatement of Torts 2d as adopted in *Keener v. Dayton Electric Manufacturing Company*, 445 S.W.2d 362 (Mo.1969). The jury's verdicts were in favor of General Motors and in favor of plaintiff against Universal. In the latter verdict plaintiff was awarded damages in the sum of $570,550.67. Both plaintiff and Universal have appealed.

Then 33 years old, plaintiff was at the home of his father-in-law, Jesse Townlian, on Thanksgiving Day 1977. Townlian owned a 1972 Chevrolet Caprice which he had purchased used in the spring of 1977. According to Townlian, the car was equipped with the jack when he bought it but he had never used nor inspected the jack. Plaintiff volunteered to install the shock absorbers which Townlian had acquired. Townlian, plaintiff and Bill Volner went to where the Caprice was parked in a driveway and Townlian opened its trunk. A sticker on the trunk door warned: "CAUTION Apply parking brake and block diagonally opposite wheel before operating jack. Do not get under car while using jack." After Townlian placed blocks under the vehicle's wheels and made sure the gear lever was in "Park," plaintiff took the jack and base plate from the trunk and commenced jacking up the right rear wheel in preparing to install the shock absorbers. Volner and Townlian then left the vicinity of the automobile as plaintiff continued his labors. While plaintiff was in the process of installing the fourth shock absorber on the left front of the car, he was sitting on the tire and wheel, which he had removed and was partially beneath the fender at that location when the car fell straight down. Plaintiff was "sort of folded up" under the fender with his legs extended forward. Volner recounted that when the car fell he heard "sort of a ripping ratchet sound and then a crash." Although the jack was still "hooked under the bumper" after the car had fallen, it would not work to lift the car off plaintiff and he had to be extracted otherwise before being taken to the hospital.

Volner related that before plaintiff commenced using the jack it looked "like new then" and after the car had fallen onto plaintiff, the jack was still in an upright position on the base plate, but the hook or load rest was lower on the column of the jack. Later the same day, Townlian finished installing the last shock absorber on the Caprice by use of the jack. However, before doing so he ground the load rest on the jack to make it fit into a slot in the front bumper and beat on the load rest with a two-pound hammer to get it to fit into the bumper slot. The next day while looking at the load rest on the jack, Townlian saw on it the words "Chevy II, 1968."

Reginald Aspland and Steve Kendall owned the Caprice before Kendall sold it to Townlian. Aspland testified there was no jack in the vehicle while he owned it. Kendall said he owned the Caprice just a short time after he bought it from Aspland and before selling it to Townlian and that he had not put a jack in the car and did not know if one had ever been in the trunk. As previously noted, Townlian said the jack was in the car when he purchased it. Other facts will be detailed, when necessary, in our discussion of the points relied on raised by the appealing parties.

## UNIVERSAL'S APPEAL

### I.

Universal's first point relied on is that the trial court erred in overruling its motion for a directed verdict filed at the close of all the evidence because plaintiff failed to prove the jack housing-column assembly was in substantially the same condition at the time of the accident as it was when manufactured.

Section 402 A, 2 Restatement of Torts 2d states: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does

reach the user or consumer without substantial change in the condition in which it is sold. (2) The rule stated in Subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller." As seen from Universal's first point relied on, it is its position that proof of elements (1)(b) were absent from the case.

In resolving Universal's first point, we bear in mind that the jury in a strict or products liability case, as in any other such case, has leave to believe or disbelieve all, part or none of the testimony of any witness [*Gibson v. Reliable Chevrolet, Inc.*, 608 S.W.2d 471, 473[1] (Mo.App. 1980)] and that this court is obliged to consider the evidence in the light most favorable to the verdict, remembering that the credibility, value and weight of the testimony of the witnesses is a matter for the jury. *Tile-Craft Products Co., Inc. v. Exxon Corporation*, 581 S.W.2d 886, 888[2] (Mo.App.1979). Also to be observed is that the doctrine of strict liability in tort does not require impossible standards of proof nor does the doctrine require that the product be new at the time of the occurrence— only that it be in substantially the same condition as when it left the manufacturer thereof. *Williams v. Deere & Co.*, 598 S.W.2d 609, 612[2 and 5] (Mo.App.1980). Likewise, if plaintiff has evidence that no alterations were made to the product after leaving the manufacturer which would cause the damages incurred, he has made a submissible case as to the existence of the defect at the time of such leaving. *Winters v. Sears, Roebuck and Co.*, 554 S.W.2d 565, 573[18] (Mo.App.1977), 89 A.L.R.3d 196.

Plaintiff's expert witness, James Somerset, had Bachelor of Science and Master of Science degrees in Mechanical Engineering and a Ph.D. degree in Mechanical and Aerospace engineering. He was employed as a professor at Syracuse University, Syracuse, N.Y. He had tested, visually and microscopically, the jack in question and other identical jacks. He found no alterations in the accident-jack, except for the load rest which had been altered subsequent to the casualty, and declared the jack had not been subjected to excessive wear or tear. His conclusion was the jack fell at the time of the accident because the pawl and configuration of the jack's teeth were improperly designed and also that the teeth had not been manufactured to conform to the design criteria in the blueprints. In short, the witness concluded the jack fell down the column thereof because it was both defectively designed and manufactured.

It is the general rule in civil cases that the testimony of a single witness, if accepted as true, is usually sufficient to establish a fact for jury consideration. *Scherffius v. Orr*, 442 S.W.2d 120, 124[2] (Mo.App.1969), and cases there cited. While we hold that Dr. Somerset's testimony was sufficient alone to establish the jack was in substantially the same condition at the time of the accident as it was when manufactured, there was other testimony along this line which the jury could have also considered. As previously noted Bill Volner, an eyewitness to the accident, testified the jack looked "like new then" and that "it wasn't in any way altered like that. It was new." The owner of the jack, Jesse Townlian, inspected it after the accident and recounted the teeth on the column were all shiny, thereby indicating the jack had been well-kept and was like new. William Christiansen examined the jack for General Motors and Keith Ulm examined it for Universal. Neither found any alterations to the jack's housing or column and no sign of excessive use or improper maintenance. In fine, neither Ulm nor Christiansen made any claim the jack was not in substantially the same condition when the accident occurred as it was when manufactured by Universal.

Universal's first point relied on is denied.

## II.

Universal says the trial court erred in denying its motion for a mistrial when plaintiff's counsel in his opening statement said to the jury: "Let's now look at the

parties to this lawsuit. The plaintiff, the person bringing this lawsuit, is Larry Tennis. Larry, before this injury, was a proud, kind, loyal, helpful 34 year old married man with three children, who had a job." Universal said a mistrial was in order, as it so moved, because the statement, though true, was inflammatory, irrelevant to any trial issue and was prejudicial to Universal's right to a fair and impartial trial.

Prior to overruling Universal's motion for a mistrial and in consideration thereof, the court, out of the jury's hearing, inquired of plaintiff's lawyer why a reference to the fact plaintiff was married and had three children was relevant. Counsel explained that the evidence, as indeed it later did, would disclose that because of plaintiff's accident injuries and resulting disability, plaintiff could not, as he had prior to the casualty, take his family on vacation trips and to amusement places, play physical activity games with the children, et cetera. In later uncontradicted testimony, plaintiff related that before being injured and because his wife worked nights and he worked days, he did "a lot of laundry, cooking, just all different kinds of household stuff . . . mowing the yard . . . or just about any type of household work, why I done it." Additionally, his household duties included baby sitting, child care and getting the children ready for school the next morning.

 Opening statements and evidence regarding a plaintiff's marital status and the number of children he has are frequently held to be inadmissible because the statements and evidence are simply designed to arouse the prejudice of the jury. *Lewis v. Hubert*, 532 S.W.2d 860, 868[16, 17] (Mo. App.1975). However, such a general rule does not apply when such statements and evidence relative thereto are germane to an issue raised in the case. *Bush v. Anderson*, 360 S.W.2d 251, 255[5] (Mo.App.1962). Plaintiff made a good faith effort to show that because of the nature and extent of his injuries he was permanently deprived of the natural companionship, society and joys he once experienced in the associations he enjoyed with his family and how this depriva-

tion affected him emotionally. Cf. *Deskin v. Brewer*, 590 S.W.2d 392, 401[23, 24] (Mo. App.1979).

We deny Universal's second point.

### III.

Universal next says the trial court erred, over its objection, in permitting a juror to take written notes throughout the trial because such allowed him to overemphasize some of the evidence and permitted him to persuade other jurors as to the accuracy of his recollections of the evidence, all to its prejudice.

The point relied on has this background. At the end of plaintiff's opening statement to the jury, one of the jurors asked concerning the court's attitude regarding "jurors making notes as we go through this." The court advised he would discuss it with the attorneys and respond to the subject following the recess. After a conference with counsel and consulting authorities on the subject, over Universal's objection the court said that considering the projected duration of the trial (it actually lasted from April 21, 1980, through May 2, 1980) and the complexity of anticipated expert testimony, note-taking by the jurors would be permitted upon the following conditions: (1) The jurors should not discuss their notes with other jurors; (2) The jurors should keep their notes to themselves; (3) The notes at the end of each day would be given to the bailiff, not taken home, and returned to the jurors the next morning; (4) At the conclusion of the lawsuit, each juror taking notes would be permitted to review same; (5) No juror was to read his notes to anyone; and (6) No notes made were to be taken into the jury room during deliberations.

Universal has not shown that the juror who took the notes complained of, violated any of the conditions imposed by the trial court or that the note-taking did, in fact, permit the juror to overemphasize any of the unspecified evidence alluded to in the point relied on. Nor did the note-taking permit the juror to persuade other jurors as to the accuracy of his recollections of the evidence. Allegations in after-trial mo-

tions, and in an appellant's brief do not prove themselves. *McIntosh v. White*, 447 S.W.2d 75, 78[3] (Mo.App.1969).

Universal admits to finding only one reported Missouri case on the subject of note-taking by jurors. Albeit Universal claims *State v. Robinson*, 117 Mo. 649, 665–666, 23 S.W. 1066, 1071[9] (1893), is authority for its position, we cannot agree. Upon appeal, Robinson claimed the guilty verdict should be vitiated because a juror took notes during the trial. The claim was denied because (1) some states, via statute, permit note-taking, (2) the authorities are not in accord on the subject, (3) the motion for new trial and a supporting affidavit did not indicate that defendant did not learn of the note-taking in time to object thereto before the verdict was returned, and (4) neither the affidavit nor the testimony of the note-taking juror could be received to impeach the verdict and "would be but the most pronounced hearsay."

 We do not undertake a recasting of the many cases cited by plaintiff upholding the trial court's action herein. It suffices to say that 27 states and 9 U.S. Circuit Courts have approved note-taking by jurors upon some or all of the conditions made by the trial court in this matter. While authorities are in disagreement as to whether jury note-taking is proper, a majority of the courts, dismissing contrary considerations as anachronisms from times when most men were illiterate, take the view that the making and use of trial notes under the conditions imposed by the trial court here is desirable and proper, especially in a trial covering an extended period of time and involving complicated expert witness testimony. A court's approval or denial of jurors' note-taking in any particular case, is usually sustained upon being a matter within its discretion. When, as here, there is no proper showing the note-taking juror made some effective use of his notes either to himself or as a persuasive force upon his fellow jurors, no prejudicial effect of the note-taking has been found. 75 Am.Jur.2d, Trial, § 934, pp. 795–796, June, 1981, Cum. Supp., pp. 175–176; 14 A.L.R.3d, Anno.

Taking and Use of Trial Notes by Jury, pp. 831–852, August, 1981 A.L.R.3d Supp., pp. 47–51. Under the facts and circumstances peculiar to this case, we cannot say the trial court erred to Universal's prejudice. Ergo, Universal's third point relied on is denied.

## IV.

 Universal's fourth point relied on: "The trial court erred in overruling [Universal's] objection to and motion to strike the testimony of witness Robert Cunitz because said testimony invaded the province of the jury, was not the proper subject of expert testimony, and was speculative and conclusionary, to the prejudice of [Universal] in obtaining a fair and impartial trial."

As written, this point provides no clue as to the nature of the testimony of the witness. Contrary to the mandates of Rule 84.04(d), V.A.M.R., the point also does not attempt to state "wherein and why" the testimony, whatever it was, invaded the province of the jury or was not the proper subject of expert testimony or was speculative and conclusory or "wherein and why" the testimony was prejudicial to Universal receiving a fair and impartial trial. Any point relied on should definitely formulate and isolate the exact issues to be reviewed. *State v. Kelsey*, 592 S.W.2d 509, 514[6, 7] (Mo.App.1979). Appellate courts have no obligation to resort to the transcript on appeal, the legal file or the argument portion of an appellant's brief in order to ascertain "wherein and why" an action or ruling of a trial court is said to be erroneous. *Meyer v. St. Louis County*, 602 S.W.2d 728, 739[19] (Mo.App.1980). Although the point does not comply with Rule 84.04(d), V.A.M.R., we must once again forgive the infraction because appellant was not afforded a second chance to do what it should have done properly in the first instance. Rule 84.08, V.A.M.R.

In substance, Universal's fourth point is that plaintiff's expert witness, an engineering psychologist with B.A., M.S. and Ph.D. degrees, was improperly permitted to testify that the warning label inside the trunk

of the car (because of its placement, color of letters and words used) was not adequate to warn persons in plaintiff's position of the danger of getting under the automobile while using the jack in question. We have previously set forth the warning label in this opinion. Universal asseverates the jurors were able to read the "Caution" label and to determine whether the warning was adequate or not without the testimony of the expert. In fine, Universal relies upon the general rule that opinion testimony of an expert should not be admitted unless it is clear that the jurors, for want of experience or knowledge on the subject, are incapable of drawing correct conclusions from facts proved. *Sampson v. Missouri Pacific R. Co.,* 560 S.W.2d 573, 586[17] (Mo. banc 1978).

Initially, plaintiff urges that as the warning label in question was the sole responsibility of General Motors, the warning label issues were of no concern to Universal. Plaintiff further says that since the jury found against plaintiff in favor of General Motors, any error which may have been the result of permitting the expert to testify was harmless to Universal. We were initially inclined to agree with plaintiff. However, as observed later in this opinion under Point VI, plaintiff's Instruction No. 10 submitted the question of Universal's liability on the theory of an inadequate warning and, we suppose, Universal was entitled to the advantages of any warnings whether given by it or General Motors. Consequently, we will consider the point.

Judge Napton, writing for the Missouri Supreme Court 121 years ago said: "The general rule is that persons of skill in any particular science or art may give their opinions, 'when the subject matter is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it without such assistance; in other words, when it so far partakes of the nature of a science or art as to require a course of previous habit or study in order to attain a knowledge of it.'" *Newmark v. Liverpool & London Fire & Life Ins. Co.,* 30 Mo. 160, 165 (1860). This is still the law. *Housman v. Fiddyment,* 421 S.W.2d 284, 289[1–4] (Mo. banc 1967); *State v. Hendel,* 468 S.W.2d 664, 667[3] (Mo.App.1971).

Dr. Cunitz, plaintiff's expert witness, is an engineering psychologist. He has had extensive experience in designing adequate warning systems and specialized in "selective attention," i. e., why and how people respond to types of stimuli. His doctoral research involved human vision and how people see and the limitations on what they see. Dr. Cunitz is the author of many papers in the field of experimental and engineering psychology. He has taught at the college level and worked extensively with safety standards involving warnings for architectural glass, swimming pool slides, lawn mowers, ladders, match covers, etc. In addition to having worked extensively with the National Bureau of Standards and Consumer Products Safety Commission, the witness has served on the Engineer's Committee of the Three Mile Island Investigation.

Plaintiff's witness recounted that a product submitted for testing was initially subjected to a hazards analysis to determine whether it required a warning label because of the way it was used or could be misused. If a hazard existed, then it became necessary to provide a psychologically effective warning to change human behavior in relation to the product so that people would not do the wrong thing with it. Because of the characteristics of human behavior and anatomy, Dr. Cunitz stated there were certain criteria to be evaluated: Is the warning given at the right time and put in the right place? Is the warning attention-getting and does it provide motivation to obey it? Does the warning tell how to avoid injury and has it been tested? The witness explained the physical aspects of the human eye and the concept of peripheral vision with regard to a caution sign sticker placed on a raised automobile trunk door while one is intent on obtaining a jack from the floor of the trunk.

The admissibility of expert testimony is predicated upon the special knowledge of the witness gained through

schooling and experience which the average juror does not have, so that the expert is better equipped to draw a conclusion on the subject than the jurors. It appears to us that Dr. Cunitz's qualifications reflect that his experience and education concerning the efficiency of communications and the manner in which people perceive and understand certain signs, warnings and similar communications were sufficient to permit his opinion on the subject which, of course, the jury was not bound to accept. The weight of expert testimony is for the jury. *Sunset Acres Motel, Inc. v. Jacobs*, 336 S.W.2d 473, 484[18] (Mo.1960). See also, *State v. Quilling*, 363 Mo. 1016, 1021, 256 S.W.2d 751, 752[2] (banc 1953). Whether or not a given warning is sufficient depends upon its placement or location, the language used and how it may or may not impress the average user. The testimony of plaintiff's expert on the impact of the warning, considering its wording, design and placement was a proper subject for expert testimony. *Bristol-Myers Co. v. Gonzales*, 548 S.W.2d 416, 431[32, 33] (Tex. Civ.App.1976), rev'd on other grounds, 561 S.W.2d 801 (Tex.1978); cf. *Bituminous Casualty Corp. v. Black & Decker Mfg. Co.*, 518 S.W.2d 868 (Tex.Civ.App.1974). Moreover, the "admission or exclusion of expert opinion testimony is a matter within the sound discretion of the trial court ... and its admission is not objectionable for the reason, without more, that it 'invades the province' of the jury or that it pertained to the 'very issue' the jury was to decide." *McKinley v. Vize*, 563 S.W.2d 505, 511[7] (Mo.App.1978). We find no abuse of discretion in allowing Dr. Cunitz to testify on the adequacy of the warning sign.

Universal's point IV is denied.

## V.

■ Universal offered a not-in-MAI instruction which read: "You are instructed that any award made to plaintiff as damages in this case, if any award is made, is not subject to Federal or State income taxes, and you should not consider such taxes in fixing the amount of any award made

plaintiff, if any you make." The trial court's refusal to give such an instruction is now claimed by Universal to have been prejudicial error.

In *Dempsey v. Thompson*, 363 Mo. 339, 345–346, 251 S.W.2d 42, 45–46[1–3] (1952), tried and decided before the birth of MAI, Div. I of the Missouri Supreme Court ruled, prospectively only, that in Federal Employers' Liability Act (FELA) cases, 45 U.S.C. § 51 et seq., the exact same instruction as proffered Instruction A, supra, was "competent and desirable to instruct the jury that an award of damages for personal injuries is not subject to Federal or State income taxes." The same author of *Dempsey* wrote in *Bowyer v. Te-Co., Inc.*, 310 S.W.2d 892, 897[5] (Mo.1958), that defendant's offered instruction if the jury found for plaintiff it " 'should include nothing therein for federal or city taxation thereon as no tax can be assessed or collected on the amount of your verdict'," was properly refused because it was "broader in its terms" than that suggested in the *Dempsey* case. *Bowyer* was not a FELA case and did not explain how or why the proffered but refused instruction was broader in terms than the one approved by *Dempsey*.

*Senter v. Ferguson*, 486 S.W.2d 644, 646, 647[1] (Mo.App.1972), was decided after the advent of MAI. *Senter* was not a FELA case but rather an action for damages arising from an automobile collision. The trial court gave the instruction approved in *Dempsey* but the court of appeals held this was reversible error as it was "clearly an addition to or 'modification' of M.A.I. 4.01" in violation of the mandates of "Rule 70.01, V.A.M.R." Application to the Missouri Supreme Court for transfer was denied.

*Ingle v. Illinois Cent. Gulf R. Co.*, 608 S.W.2d 76, 80[4] (Mo.App. Jan. 1980), application to transfer denied Sept. 1980, was a FELA case wherein a juror asked the court if he could ask a question. When told to put his question in writing, the juror wrote " 'What taxes come out of any settlement?' " The court responded in writing that " 'You have been fully instructed.' " Upon appeal, defendant claimed "the trial

court erred by failing to instruct the jury on whether the award would be taxed to the plaintiff." The court of appeals held the trial court's action was proper, saying that as MAI 24.01 does not provide for a charge on taxation "it would have been error for the court to have given the requested instruction." See also, *Dunn v. St. Louis-San Francisco Ry. Co.*, 621 S.W.2d 245, 254[16] (Mo. banc 1981).

The administratrix of a decedent's estate brought a FELA action in an Illinois circuit court. Although an expert witness calculated that the decedent's gross earnings until retirement, plus the value of services he would furnish his family, less sums the deceased would have spent upon himself, would amount to $302,000, a jury awarded $775,000 in damages. Upon appeal, *Liepelt v. Norfolk & W. Ry. Co.*, 62 Ill.App.3d 653, 19 Ill.Dec. 357, 370, 378 N.E.2d 1232, 1245[15] (1978), it was ruled the trial court did not err in refusing "to instruct a jury as to the nontaxability of an award" and that it was "not error to exclude evidence of the effect of income taxes on future earnings of the decedent." On certiorari, *Norfolk & Western R. Co. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), reh. den., 445 U.S. 972, 100 S.Ct. 1667, 64 L.Ed.2d 250, a majority of the United States Supreme Court, in partial reliance on Missouri's *Dempsey*, supra, reversed and remanded. In substance, it ruled (a) the state trial court erred in excluding evidence of the income taxes payable on decedent's past and estimated future earnings as a wage earner's income tax was a relevant factor in determining the monetary loss suffered by his dependents because of death, and (b) the state court erred in refusing to instruct the jury as to the nontaxability of the amount of the verdict because the instruction was short, easily understood, would not complicate the trial by requiring other qualifying instructions and would not prejudice either party but would serve to eliminate any speculation that might have an improper impact on the jury in computing the amount of the award.

We now attend to MAI. In the Second Edition thereof and the 1978 revision there-

to effective when the case herein was tried, MAI 4.01, given by the court at plaintiff's request, was the only authorized and permissible measure of damage instruction in a non-FELA case. The then only FELA damage instructions pertaining to death or injury to employees, were MAI 8.01 and 8.02, neither of which made reference to the nontaxability of any award. However, in the 3rd Edition of MAI effective January 1, 1982, which "may be used prior thereto without such use being presumed to be error" (May 12, 1981, Supreme Court of Missouri En Banc Order, p. XXI MAI 3d Ed.), both MAI 8.01 and 8.02 have added a new sentence that "any award you may make is not subject to income tax." The "Committee's Comment (1981 Revision)" specifies that these instructions are to be "used only in an F.E.L.A. case .... The reference to taxation is used in F.E.L.A. cases in compliance with *Norfolk & Western Ry. Co. v. Liepelt*," supra. It seems worthy of note that although FELA instructions MAI 8.01 and 8.02 were changed in the 3rd Edition of MAI in compliance with *Norfolk*, MAI "4.01 [1980 Revision] Damages—Personal and Property" has not been altered nor amended to include a direction that any awarded damages are "not subject to income tax."

As observed in *Norfolk & Western R. Co. v. Liepelt*, supra, 444 U.S. at 493, 100 S.Ct. at 757, 62 L.Ed.2d at 693, questions concerning the measure of damages in FELA actions are federal in character even if the action is brought in a state court. In the case before us, federal concerns are lacking. *Croce v. Bromley Corp.*, 623 F.2d 1084, 1096–1097[11] (5th Cir. 1980), cert. den., 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981), which was decided subsequent to and which discussed *Liepelt* at length, held the trial judge did not err in refusing to charge the jury, as requested, that any award to plaintiffs would not be subject to federal income taxation in a wrongful death action predicated upon state statutes. Accord: *Barnette v. Doyle*, 622 P.2d 1349, 1365–1367[20–21] (Wyo.1981). The same reasoning expressed in *Croce* and *Barnette* applies here. Plaintiff's action in our case

was a state cause of action, tried in a state court and was wholly lacking in any federal concern. Because of what we have heretofore observed, and especially because no applicable MAI includes any reference to the fact that jury awards in personal injury actions are not subject to income taxation, we hold the trial court did not err in refusing to give Universal's offered instruction.

We deny Universal's Point Relied on V.

## VI

Universal contends the trial court erred in giving instructions 9 and 10 (MAI 25.04 and 25.05) because they were verdict-directing instructions on two different theories, i. e., defective product and failure to warn, and should have been combined into a single instruction e. g. MAI 17.02, and, in some respects, submitted the same hypotheses to the jury twice.

Instruction No. 9: "Your verdict must be for plaintiff and against defendant Universal ... if you believe: First, defendant Universal ... sold the jack housing-column assembly in the course of its business, and Second, the jack housing-column assembly was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and Third, the jack housing-column assembly was used in a manner reasonably anticipated, and Fourth, plaintiff was damaged as a direct result of such defective condition as existed when the jack housing-column was sold by defendant Universal ...."

Instruction No. 10: "Your verdict must be for plaintiff and against Universal ... if you believe: First, defendant Universal ... sold the jack housing-column assembly in the course of its business, and Second, the jack housing-column assembly was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and Third, defendant Universal ... did not give an adequate warning of the danger, and Fourth, the product was used in a manner reasonably anticipated, and, Fifth, plaintiff was damaged as a direct result of the jack housing-column assembly being sold by defendant Universal ... without an adequate warning."

Rules 70.02(b) and (c), V.A.M.R., admonish that "Whenever Missouri Approved Instructions contains an instruction applicable in a particular case which the appropriate party requests or the court decides to submit, such instruction shall be given to the exclusion of any other on the same subject" and "The giving of an instruction in violation of the provisions of this Rule shall constitute error, its prejudicial effect to be judicially determined." Moreover, any changes made to applicable instructions are presumed to be prejudicial error [*Phelps v. Parker*, 569 S.W.2d 22, 23[1] (Mo.App.1978)], for the courts require strict adherence to MAI instruction forms and the Notes on Use. *Davis v. St. Louis Southwestern Railroad Co.*, 444 S.W.2d 485, 489 (Mo.1969).

Universal argues, without illustrating how, that MAI 25.04 and 25.05 should have been combined into a single instruction similar to MAI 17.02, which is a single verdict director relating to a motor vehicle accident which submits multiple negligent acts. We note, however, that MAI contains no instruction which undertakes to combine MAI 25.04 and 25.05. Also, any attempt at combining unrelated paragraphs in MAI 25.04 and 25.05 into a single charge would surely result in confusion and misdirection through an unauthorized amalgamation and commingling of elements germane only to product defects and those pertaining solely to failure to warn. Moreover, the Notes on Use under MAI 32.23 clearly contemplates plaintiff's use of both MAI 25.04 and 25.05 in appropriate cases.

Universal's Point Relied on VI is denied.

## VII

Universal's last point relied on: "The trial court erred in accepting and filing the verdict, because it is so excessive in amount ($570,550.67) as to require substantial remittitur." Wherein and why the verdict was so excessive as to require a substantial remittitur is not addressed in the

point relied on as mandatorily required by Rule 84.04(d), V.A.M.R. A point which merely asserts, as does this point, that the judgment or verdict is excessive without explaining wherein and why it is excessive, preserves nothing for appellate review. *Bradley v. Dorsey*, 495 S.W.2d 88[1] (Mo. App.1973). Nevertheless, and because this court did not afford Universal a second opportunity to comply with the rules as mandated in Rule 84.08, V.A.M.R., we must excuse the failure and attend to a consideration of the point upon its merits, if any.

■ Excessive verdicts are of two sorts, i. e., those which are simply excessive and those whose excessiveness results from jury misconduct through bias and prejudice. *Walker v. Meder*, 609 S.W.2d 390, 391 (Mo. banc 1980). Simple excessiveness is curable by required remittitur which a trial court has discretion to enforce by order. *Nussbaum v. Kansas City Stock Yards Co. of Maine*, 359 S.W.2d 335, 341 (Mo.1962); *Stubbs v. Kansas City Terminal Ry. Co.*, 427 S.W.2d 257, 260[2] (Mo.App.1968). On the other hand, excessiveness because of bias and prejudice mandates a new trial. In this court Universal has forsaken its trial-court contention that the alleged excessiveness resulted from bias and prejudice of the jury. Consequently, Universal's point relied on VII, supra, is simply that the trial court abused its discretion in not finding, as a matter of law, the jury awarded too much under the ultimate test of what amount would fairly and reasonably compensate plaintiff for the injuries and damages he sustained. *Graeff v. Baptist Temple of Springfield*, 576 S.W.2d 291, 309[18] (Mo. banc 1978); *Morris v. Israel Brothers, Inc.*, 510 S.W.2d 437, 447[13] (Mo.1974); *Williamson v. Wabash R. Co.*, 355 Mo. 248, 256, 196 S.W.2d 129, 134[9] (1946); *Woodford v. Illinois Central Gulf Railroad Co.*, 518 S.W.2d 712, 718 (Mo.App.1974).

■ Among factors which bear on whether a verdict is excessive vel non are: (1) Plaintiff's loss of income and the reasonably anticipated future loss of income because of the injuries sustained; (2) the amount of hospital, medical and other similar expenses plaintiff has incurred and is reasonably liable to incur in the future; (3) plaintiff's age; (4) the nature and extent of plaintiff's injuries, the permanency thereof and how such injuries have, and will in the future, affect plaintiff's ability to work and ability to participate in the usual activities of general living and enjoyment; (5) due regard for economic factors, such as inflation; (6) awards given and approved in cases of a similar nature; and (7) an appreciation of the fact the jury and trial court had a superior opportunity to appraise plaintiff's injuries and other damages. Of course in reviewing the excessiveness of a verdict, only the evidence favorable to plaintiff should be considered. *Blond v. Overesch*, 527 S.W.2d 663, 672 (Mo.App. 1975); *Woodford v. Illinois Central Gulf Railroad Co.*, supra, 518 S.W.2d at 718[14].

■ Before the car fell on plaintiff on the day of the accident as previously described, plaintiff was 33 years old with a life expectancy of 38.9 years. Because of his educational and intelligence background, plaintiff's work opportunities were confined to jobs involving physical labor such as heavy equipment operator, truck driver, mechanic, assembly line operator, etc. At the time of the casualty plaintiff was employed as a truck driver and operated an 18-wheel sand truck. Prior to the accident plaintiff's health was excellent—he had no bodily impairment, pain or disability.

The accident produced fractures and a dislocation of spinal vertebra, intervertebral disc injuries, displacement and compression and nerve root injuries. Plaintiff's first hospitalization lasted one month. During this time he underwent major surgery and two Harrington rods were permanently placed in his back. While in the hospital on three other subsequent occasions plaintiff was treated, inter alia, for severe hip pain and muscle spasms. Another operation was performed for the removal of a portion of his backbone and he received a myelogram. There was evidence that plaintiff, for a considerable time following the accident, was immobile, lost weight, was confined to a wheelchair, was on crutches, wore back

and leg braces and suffered such pain that he often cried. Extended physical therapy caused pain and discomfort. The pain has persisted, with little abatement since the accident and extends from his back into his hips and right leg. Sitting, standing or walking brings no pain relief. He lost full range of motion in both legs and, for a time at least, lost the ability to urinate naturally. Plaintiff's sexual ability has been virtually terminated because of his accident injuries. He is totally and permanently disabled from work, and has incurred medical bills in excess of $8,000 with prospective medical bills and expenses because of arthritis in the back. Plaintiff's past and future lost wages and income, reduced to present value, was shown to be more than the sum of the jury's verdict.

In reviewing awards given and approved in cases of a similar nature, we first observe that no exact formula exists for determining whether a verdict is excessive. Each case stands or falls on its own facts. *Chism v. White Oak Feed Co., Inc.*, 612 S.W.2d 873, 884 (Mo.App.1981). Furthermore, courts must recognize the constantly eroding purchasing power of the dollar and acknowledge that cases decided some six years or more before the present action was jury-determined should not be considered in applying the rule of uniformity. *Sanders v. H & S Motor Freight, Inc.*, 526 S.W.2d 332, 339[8] (Mo.App.1975). It has been observed that the purchasing power of the dollar eroded 20% between 1965 and 1970 [*Zipp v. Gasen's Drug Stores, Inc.*, 449 S.W.2d 612, 623 (Mo.1970)] and in excess of 30% between 1957 and 1971. *Shaffer v. Kansas City Transit, Inc.*, 463 S.W.2d 606, 610[2] (Mo.App.1971). Courts would be sorely remiss in failing to acknowledge that the dollar's purchasing power has continued to decline subsequent to the dates noted in the just cited cases and in blindly accepting dollar figures in none but the most recent opinions in determining uniformity. Six of the cases relied on by Universal were decided 16 to 23 years ago and cannot be considered authority in deciding the excessiveness vel non of the verdict in this case. With one exception, to be noted later, the other opinions relied on by Universal are so dissimilar to the facts here as to have no pertinent value.

At the time of the accident in *Ingle v. Illinois Cent. Gulf R. Co.*, supra, 608 S.W.2d 76, Ingle was 45 years old and earning $12,000 per year, which was slightly less than the 33-year-old plaintiff in this case was receiving. Ingle was hospitalized three times when he received a myelogram, cervical and lumbar disc surgery and insertion of a nerve stimulator affixed to a limb. His right arm permanently atrophied so that he possessed only about 3/5th the strength of his left arm. Ingle's condition was permanent and deteriorating and his pain was constant. Provided it was equipped with power steering and power brakes, Ingle could drive a car. The jury's $550,000 award to Ingle was not attacked as being excessive. Nevertheless, in consideration of a contention by defendant, the appellate court observed (l.c. 83) that "the damages awarded are not excessive." In the instant action, plaintiff was 12 years younger than Ingle when injured and the $20,550.67 difference between the $550,000 awarded to Ingle and the $570,550.67 award to plaintiff here can easily be attributed to the differences in ages, life expectancy and loss of earnings.

In the above mentioned case cited by Universal, *Koehler v. Burlington Northern, Inc.*, 573 S.W.2d 938, 946[28] (Mo.App.1978), it was ruled that a $600,000 verdict in favor of the 45-year-old female plaintiff was not excessive. Mrs. Koehler had been employed at $9,600 per year as a factory worker. She sustained spleen and bladder ruptures, crushed pelvic bones, left forearm bone fractures, broken ribs, impairment of arm movement, leg limp and permanent back pain. Doctor and hospital bills exceeded $11,000 and there were potential future complications resulting from internal injuries and scar tissue. It is difficult to comprehend why Universal cites *Koehler* to prove excessiveness here when considering that Mrs. Koehler was 12 years older, thus a shorter life expectancy, and had yearly earning of some $3,000 less than plaintiff

herein and obtained a verdict of about $29,-500 more than was awarded in this action.

Cases cited by plaintiff which illustrate the award herein was not excessive, include the following. *Clark v. City of Chicago*, 88 Ill.App.3d 760, 43 Ill.Dec. 892, 410 N.E.2d 1025 (1980)—plaintiff had injuries to his hip, legs and pelvis, suffered constant pain, and was unable to perform manual labor or work which required constant standing or walking. A $1,102,000 verdict was ruled not to be excessive. *Murray v. Fairbanks Morse*, 610 F.2d 149 (3d Cir. 1979)—the 34-year-old plaintiff could only perform manual labor because of a limited education. He had spinal injuries necessitating two operations, sexual dysfunction, constant pain and depression. Although he was able to resume "light work", the $1,747,000 verdict was said not to be excessive. *McGee v. Burlington Northern, Inc.*, 174 Mont. 466, 571 P.2d 784 (1977)—plaintiff was hit by a steel door handle which protruded from the side of a railroad car causing injuries to his neck, back and knee which left him unable to work. The $618,000 damages awarded were ruled not excessive.

Although the cases cited herein do not exactly parallel the facts presented in the instant matter, there is sufficient similarity to require us to conclude that the damages herein assessed by the jury were not excessive. This conclusion is further augmented by the recognition that the assessment of damages is primarily the function of the jury which is in a far better position than this court to appraise the nature and extent of plaintiff's injuries, his economic and other losses and to award a sum which will reasonably and fairly compensate him. *Koehler v. Burlington Northern, Inc.*, supra, 573 S.W.2d at 946[27]. Universal's seventh and final point relied on is denied.

Judgment for plaintiff and against Universal is affirmed.

## PLAINTIFF'S APPEAL

Rule 84.04(a), V.A.M.R., mandatorily requires that "[t]he brief for appellant shall contain: (1) A concise statement of the grounds on which jurisdiction of the review

court is invoked; (2) A statement of the facts; (3) The points relied upon; and (4) An argument which shall substantially follow the order of 'Points Relied On.'" The subsequent subsections of the rule clearly indicate that the divisions of an appellant's brief should be limited to and put in the order specified. Nevertheless, in patent disregard of these mandates, plaintiff's brief is composed as follows: (1) Index; (2) Table of Authorities; (3) Jurisdictional Statement; (4) Points Relied On; (5) Statement of Facts; and (6) Argument. Also contrary to the concluding sentence of Rule 84.04(d) that "[l]ong lists of citations should not be included," we note that, excluding nine citations to statutes and Missouri Approved Jury Instructions (MAI), plaintiff has cited 41 cases in his brief. While plaintiff may disagree with the commands of the Missouri Supreme Court via its rules and consider his combination of brief ingredients superior to those ordered, we suggest that his future compositions should comply with the judicial edicts noted lest he find his appeal dismissed for rule infractions.

### I.

As part of his case-in-chief, plaintiff read into evidence portions of the deposition testimony of an employee of Universal. In conjunction therewith plaintiff offered several exhibits [numbered 5, 95, 108, 108(a) and 108(b)]. These exhibits consisted of a certain type of bumper jack, a patent and drawings relating thereto. The jack was equipped with a flexible type hook designed to fit the bumpers of most American made cars. Plaintiff's first point relied on is that the trial court erred in refusing to admit these exhibits.

In our disposition of the first point relied on in plaintiff's appeal against General Motors, we find it unnecessary to discuss plaintiff's various urgings as to why the trial erred in refusing to admit the exhibits into evidence. This is so for a variety of reasons. First, the trial court ruled and instructed the jury, without a then objection from plaintiff, that the deposition testimony of Universal's employee was to be con-

sidered only in plaintiff's claim against Universal and was not to be considered as evidence against General Motors. Second, at the time the deposition testimony and the exhibits relating thereto were offered, the only evidence which had been adduced by plaintiff was that the car had fallen onto and injured the plaintiff because that part of the jack engaged to the bumper slid down the column of the jack and not because the bumper holder failed or became disengaged from the bumper. Third, although plaintiff's efforts at the trial to get the exhibits admitted into evidence were protracted and disjointed, he nevertheless stated that Exhibit No. 95, and inferentially the other exhibits, was being offered against Universal only—not against General Motors. Consequently, it is difficult to comprehend how plaintiff now has standing to champion a contention that the trial court erred to his prejudice in his claims against General Motors by refusing exhibits offered in conjunction with testimony received only against Universal and intended for determination of issues existing solely between plaintiff and Universal.

Without objection by plaintiff, the testimony of Universal's employee was received under the court's admonition that such was admissible only against Universal. Exhibit No. 95, and perhaps the others, was tendered by plaintiff on the express assertion that it was offered only against Universal. Having adopted that theory below, plaintiff may not now successfully complain that the trial court erred in refusing to admit the exhibits against General Motors. *Rogers v. Toro Manufacturing Company*, 522 S.W.2d 632, 639[14] (Mo.App.1975); *Haire v. Stagner*, 356 S.W.2d 305, 308[3] (Mo.App.1962); 5 Am.Jur.2d, Appeal and Error, § 546, at p. 31. Moreover, if the court's ruling was erroneous, the error was either against or in favor of Universal and plaintiff may not responsibly complain thereof in its appeal against General Motors. *Homan v. Missouri Pac. R. Co.*, 335 Mo. 30, 70 S.W.2d 869 (1934) and 334 Mo. 61, 64 S.W.2d 617 (banc 1933), cert. den., 291 U.S. 683, 54 S.Ct. 561, 78 L.Ed. 1070 (1934).

Plaintiff's first point relied on is denied.

## II.

Plaintiff next complains of the trial court's refusal to admit into evidence during the testimony of Robert Cunitz [see Point IV under "Universal's Appeal," supra] his proffered exhibits numbered 41, 42 and 43. These exhibits were, respectively, photographs of warning signs placed on a jack, spare tire cover and jack base found in certain 1979 and 1980 models of cars manufactured by General Motors. The exhibits were offered to illustrate the proper placement of warning signs with regard to the safe use of jacks. Plaintiff argues that such post-accident warning changes and modifications effected by General Motors, as shown by the rejected exhibits, are admissible in strict liability cases to show it would have been possible, feasible and practicable to have attached such warnings on the jack used by plaintiff and in the 1972 Chevrolet on which he was working when injured.

At least in this particular appeal, we deem it unnecessary and unrewarding to determine whether Missouri should or should not follow or adopt one or the other of the diverse and divergent holdings among various American jurisdictions as to the admissibility vel non of evidence concerning post-accident changes in allegedly defective products or warnings in strict liability actions. No exact Missouri decision dealing with the subject has been cited and our research has unearthed none. Consequently, if our Supreme Court determines that resolution of the problem should be made in this cause, the way is open to plaintiff to seek such action by following the route detailed in Rule 83.03, V.A.M.R.

In the testimony of Dr. Cunitz, he was permitted to say that the warnings on the car that fell and injured plaintiff were not properly placed to adequately warn plaintiff. He was also allowed to testify where such warnings could and should have been placed to attract plaintiff's attention to the specific dangers involved. In conjunction with such testimony, plaintiff was

permitted to introduce into evidence photographic exhibits which illustrated, according to Dr. Cunitz, the proper placement of warning signs inside the trunks and on the jacks of three automobiles manufactured by firms other than General Motors. The admitted exhibits served to illustrate the averred proper placement of warning signs—this was the same illustration intended by the rejected exhibits. It is basic that any error, if so, which might arise from the exclusion of evidence or exhibits is harmless where the same facts are shown by other evidence and exhibits. *Workes v. Embassy Food Enterprises, Inc.*, 592 S.W.2d 864, 867[1] (Mo.App.1979).

Plaintiff's second point is denied.

### III.

As to plaintiff's claims against General Motors, the trial court gave two verdict directing instructions patterned after MAI 25.04 and MAI 25.05. The instructions read: "Instruction No. 6 Your verdict must be for plaintiff and against defendant General Motors ... if you believe: First, defendant ... sold the jack in the course of its business, and Second, the jack was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and Third, the jack was used in a manner reasonably anticipated, and Fourth, plaintiff was damaged as a direct result of such defective condition as existed when the jack was sold by defendant General Motors ...." "Instruction No. 7 Your verdict must be for plaintiff and against defendant General Motors ... if you believe: First, defendant ... sold the jack in the course of its business, and Second, the jack was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and Third, defendant ... did not give an adequate warning of the danger, and Fourth, the product was used in a manner reasonably anticipated, and Fifth, plaintiff was damaged as a direct result of the jack being sold by defendant ... without an adequate warning."

In response to plaintiff's two verdict-director instructions, supra, General Motors offered and the trial court gave one converse instruction, as follows: "Instruction No. 8 Your verdict must be for defendant General Motors ... unless you believe that the jack was used in a manner reasonably anticipated."

Plaintiff's third point relied on, in effect, is that as he, in instructions numbered 6 and 7, supra, submitted alternative theories of strict liability, i.e. product defect and failure to warn, it was error for the court to give a single converse instruction in a situation when two such instructions were required. Much of plaintiff's argument to this point is based on the 33 series of MAI, "Converse Instructions," as such appears in the 1980 Supplement. However, as counsel for General Motors notes, the instructions and notes on use in the 1980 Supplement were not mandatorily effective until June 1, 1980, or after this case was submitted and determined by the jury. Therefore, what we are concerned with here is the Second Edition of MAI and the 1978 revisions thereof.

To say that one or more converse instruction in any given situation is required or necessary in the trial of a lawsuit to a jury is incorrect. As Elwood L. Thomas notes in his writings on "Converse Instructions Under MAI," 42 Missouri Law Review 175, and as MAI 2d Ed., p. LI, confirms, converse instructions are not mandatory but are simply made available to defendants to be used or not at their option. Of course, if a defendant decides to have a converse instruction or instructions given, it or they must be correct in both content and amount.

In deciding to ask for a converse instruction, defendant was not required to converse all or any particular part of plaintiff's verdict directing instructions. The defendant, at its option, had leave to converse any one or more of the elements essential to plaintiff's case. *Anderson v. Cahill*, 528 S.W.2d 742, 747[3] (Mo. banc 1975); *Lietz v. Snyder Manufacturing Company*, 475 S.W.2d 105, 109[5, 6] (Mo.1972);

Rule 70.02(f), V.A.M.R.; MAI 33.01 "Converse Instructions—General Comment." Although plaintiff's two verdict-directors differed in that one concerned product defect and the other failure to warn, each required the same finding of an essential element common to both, to wit: that the jack or product was used in a manner reasonably anticipated. *Keener v. Dayton Electric Manufacturing Company*, 445 S.W.2d 362, 366[7] (Mo.1969). General Motors' instruction conversed only the element common to plaintiff's two verdict directing instructions. Therefore, the use of a single converse was correct. *Kopp v. C. C. Caldwell Optical Co.*, 547 S.W.2d 872, 881[6] (Mo.App.1977).

Plaintiff's third point is denied.

## IV.

Plaintiff insists, for various reasons, that the trial court erred in ordering him to pay $210 to General Motors for the deposition testimony plaintiff obtained from General Motors' employee Christiansen. We find it necessary to consider only one reason in sustaining plaintiff's complaint.

■ As previously noted, the jury's verdicts were returned May 2, 1980. Being victorious therein, General Motors filed no motion for a new trial. However, and for the first time, General Motors on June 11, 1980, filed its "Motion to Pay Expert Fees" wherein it prayed "the Court to make and enter its order requiring plaintiff to pay to the said William P. Christiansen the sum of $550.00 as [expert] fees for testifying [at the deposition] at the request of plaintiff . . . ." Under date of August 1, 1980, the court, inter alia, ordered: "Motion of defendant General Motors . . . to pay expert fees is sustained. Plaintiff ordered to pay to defendant General Motors . . . the sum of $210.00."

Rule 56.01(b)(4)(b), V.A.M.R., provides: "(4) *Trial Preparation: Experts.* Discovery of facts known and opinions held by experts . . . : . . . (b) A party may discover by deposition the facts and opinions to which the expert is expected to testify. Unless manifest injustice would result, the court shall require that the party seeking discovery pay the expert a reasonable fee for responding to discovery by deposition."

The careful reader will observe that the "Motion to Pay Expert Fees" asked that plaintiff be required to pay Christiansen such a fee for his deposition testimony as provided in Rule 56.01, supra. However, and contrary to both the motion and the rule, the court required plaintiff to pay the fee to General Motors. This discrepancy is especially significant when it is considered that there was no claim or proof that Christiansen, a full-time employee of General Motors, had ever billed plaintiff or anyone for an expert witness fee or, if so, that General Motors had paid Christiansen such a fee and was thereby entitled to reimbursement therefor. It is basic that an order or judgment must conform not only to the evidence but to the pleadings and a judgment, decree or order made outside the record issues is invalid. *Brotherton v. City of Jackson*, 385 S.W.2d 836, 841[7] (Mo.App. 1965).

Plaintiff's point relied on IV is sustained.

## V.

Plaintiff's fifth and final point relied on, as all the others, has many facets. In general, plaintiff contends the trial court erred in refusing to require General Motors to produce its files relative to other bumper jack accidents or in not suppressing the testimony of General Motors' employee William P. Christiansen.

■ The first discovery device employed by plaintiff was a set of interrogatories seeking to secure information concerning complaints received by General Motors relating to bumper jacks, accidents and injuries relative thereto, etc. General Motors' answers were, in plaintiff's opinion, evasive and plaintiff moved for sanction. Plaintiff thereafter filed a third set of interrogatories asking for information concerning the names of cases in which Christiansen had testified in jack failure cases. Answers to the third set of interrogatories were also thought to be evasive and plaintiff sought

sanction. The court ordered General Motors to reanswer the two sets of interrogatories and it complied. While the legal file indicates General Motors was initially evasive and dilatory in answering the interrogatories, it did, nonetheless, answer them before trial and plaintiff did not thereafter seek sanctions because of General Motors' derelictions. A trial court is vested with wide discretion in determining if prejudice exists as the result of improper actions used in discovery. *Bethell v. Porter*, 595 S.W.2d 369, 377[10] (Mo.App.1980); *Hilmer v. Hezel*, 492 S.W.2d 395, 397[4] (Mo.App.1973). As plaintiff has not alleged an abuse of discretion this court should not, sua sponte, find one.

■ On the first day of the trial, plaintiff served Christiansen with a subpoena decus tecum to produce certain files, notes, reports, records, photographs and documents relating to Christiansen's "analysis of this case" and upon which he relied on in preparing his analysis and testimony in the present action. The subpoena also sought production of other files, etc., maintained by General Motors and which Christiansen had referred to or relied on "in jack failure complaints or cases." The court ultimately ordered the first noted items to be produced but denied the production of the others.

Plaintiff complains that he was prejudiced when Christiansen did not comply with the entire subpoena decus tecum before the court ordered otherwise because Christiansen could and should have obtained the materials when he returned to Detroit the first weekend after the trial commenced. The trouble with this assertion is that there is no tangible evidence that Christiansen did, in fact, return to Detroit when plaintiff claims or if he did return to Detroit that Christiansen had access to the requested records and information. The only information possessed by this court that Christiansen returned to Detroit when plaintiff claimed, is the statement made by plaintiff's counsel to the trial court and to this court in plaintiff's brief. Proof of facts cannot be bottomed upon unproven assertions made to a trial court or to this court in

an appellant's brief. *Ward v. State*, 451 S.W.2d 79, 81[1, 2] (Mo.1970); *Gonseth v. K & K Oil Company*, 439 S.W.2d 18, 25[12] (Mo.App.1969) and cases cited in footnote 6. "An offer of proof should be 'specific and definite' and not a mere statement of counsel." *Hawkins v. Whittenberg*, 587 S.W.2d 358, 363[10] (Mo.App.1979). The proper procedure when, as here, the witness is present, is to put him on the stand and establish the facts required and enable the trial court to ascertain the existence vel non of the assertions of counsel. *State v. Sullivan*, 553 S.W.2d 510, 513[2] (Mo.App.1977).

■ Moreover, plaintiff did not at trial object to the trial court's rulings on the subpoena duces tecum and, in his motion for a new trial, plaintiff did not specify what rulings of the trial court in this regard he considered error. Plaintiff's final contention in his brief and in his motion for a new trial was that Christiansen changed his testimony at trial from that given by deposition and that such change came as a "complete surprise to plaintiff." If plaintiff was indeed surprised, he should have made this known to the trial court when the so-called surprise occurred and sought time and other remedies to recover from the shock. However, plaintiff's cross-examination of Christiansen, which consumes some 111 pages of the transcript, belies any claim of surprise—which plaintiff did not advance until his new trial motion was filed. We deny plaintiff's point V.

That portion of the judgment of the trial court ordering plaintiff to pay General Motors $210 for expert witness fees is reversed. Otherwise, the judgment is affirmed in its entirety.

FLANIGAN, J., recused.

GREENE, P. J., concurs.

PREWITT, J., concurs and files concurring opinion.

PREWITT, Judge, concurring.

I concur in the principal opinion except for the comments regarding the brief of plaintiff-appellant. I do not read Rule 84.-

04 as prohibiting additional contents in an appellant's brief, nor as specifying the sequence of its essential parts. I believe that reasonable additions may be made to a brief consistent with its purpose and that the additions here were reasonable. For a brief with five main points, divided into fifteen subpoints, the case citations were neither unusual nor excessive.